THE STATE ex rel. JESSE W. BARRETT, Attorney-General, v. BOECKELER LUMBER COMPANY et al.

In Banc, December 3, 1923. *

1. 'COMBINATION IN RESTRAINT OF TRADE: Lumber Exchange. A lumber exchange, made up of nineteen corporations, is shown by the evidence in this case to have been employed in fixing the retail price of lumber sold by its members and designed for lessening competition among them. and is *held* to be an unlawful combination in restraint of trade, in violation of the statutes.

2. ———: Information: General Allegations. An information in *quo warranto*, filed by the Attorney-General in his official capacity, charging, in general terms, that respondent corporations have entered into a combination which results in the restraint of lawful trade and free competition in the sale of lumber, with the purpose and design to regulate, control and fix the price thereof, to maintain such price when so regulated and fixed, and to fix the quantity of lumber to be bought and sold, and that by reason of such combination respondents have been guilty of illegal, wilful and malicious perversion and abuse of their franchises, is sufficient.

3. ———: Proof: By-Laws. An incorporated exchange, whose members are corporations engaged in the retail sale of lumber, may be shown by its articles of association, by-laws and regulations to be a combination "designed and made with the view to lessen" lawful trade and to increase the market price of lumber.

4. ———: ———: ———: Punishment: Fees: Credits: Contracts: Estimates: Cost Data: Inspection. By-laws of an incorporated exchange—which has no capital stock, is not a profit-sharing company, is not itself engaged in retail trade, whose members consist of a large number of corporations engaged in the retail sale of lumber in and near the city of St. Louis—which provide for estimates and inspection of the stocks of its members, seek to control their credits, contracts, terms of sale and payment, make them responsible for the acts of their salesmen and solicitors, provide

NOTE: Opinion filed July 28, 1923; Motion to modify judgment overruled October 6, 1923; Order overruling motion to modify set aside October, 8, and motion sustained in part; Separate opinions of JAMES T. BLAIR, GRAVES and WHITE, JJ., on motions to modify, filed December 3, 1923.

for cost accounting and standardization of methods of credits, fix and attempt to enforce an arbitrary service charge (or cost of doing business from the manufacturer to the consumer), fix a membership fee of a thousand dollars and annual fees of seventy-five cents for each thousand feet of lumber sold, which alone produce an annual fund of seventy-five thousand dollars, to be used solely in carrying on its activities and enforcing its regulations and rules, and empowering it to punish, by large fines, suspension or expulsion, members who violate said by-laws, or rules or regulations made in pursuance thereto, and provide for trials of accused members in their absence and their conviction on hearsay evidence, should be read in connection with each other, and when so read they show an outlined scheme affording an excellent opportunity to the exchange and its members for the creation and accomplishment of an unlawful combination in restrain of trade.

5. ———: ———: ———: **Controlling Credits.** An undertaking by an association of a large number of corporations engaged in the retail sale of lumber to control credits among its members is an invasion of an important field of free and full competition.

6. ———: ———: ———: **Controlling Salesmen of Members.** A by-law of a non-profit-sharing association of corporations engaged in the retail sale of lumber which undertakes to govern the activities of salesmen and solicitors working in the employ of a member, is evidence of a combination in restraint of trade, since it indicates an illegal understanding between them.

7. ———: ———: ———: **Curtailing Effort to Procure Business.** Power lodged by a by-law in an exchange whose members are corporations engaged in the retail sale of lumber, to render illegal the effort of a member to secure business apparently belonging to another member, prior to the closing of a binding contract, points to an unlawful combination in restraint of trade.

8. ———: ———: ———: **Advancing Money and Taking Mortgage.** A by-law denying to members of an exchange made up of corporations engaged in the retail sale of lumber, the right to advance money to a contractor for a legitimate purpose, or to take a mortgage on account, or to forego a materialman's lien, and for such conduct subjecting the member to fine, public reprimand or suspension, whether such power is exercised or not, is evidence that the exchange is an unlawful combination in restraint of trade.

9. ———: ———: ———: **Reporting Sales: Furnishing Copies of Contracts: Information of Prevailing Prices.** A by-law of an exchange, composed of corporations engaged in the retail sale of lumber, requiring contracts for future delivery of lumber sold to be in writing and signed by the parties, copies to be immediately filed with the manager of the exchange and delivery thereunder to be re-

State ex rel. Barrett v. Boeckeler Lumber Co.

ported to him specifically, is not to be regarded as a harmless regulation, designed solely for the enlightenment and education of the members as to prevailing prices and for protecting customers and members from mistakes, but is evidence of providing a method for checking up the business of the members competing for the particular business, to see that they do not cut prices.

10. ———: ———: ———: Estimates. By-laws dealing with the subject of estimates on lumber and lumber products, and asserting that knowledge of estimates and actual sales made by a member must be afforded to the exchange (or association of members) in order to guarantee intelligent competition, although they contain no words intimating that such knowledge will be used to penalize the member making the estimates or consummating the sale if he quotes or sells at a too low figure, are, *Held*, when read in connection with all the the other by-laws, to indicate with certainty the imposition of penalties.

11. ———: ———: ———: Service Charge: Surveys By-laws reciting the basic principles underlying the production and distribution of lumber, and undertaking to fix and force upon a retail dealer an arbitrary service charge, or cost of doing business, not only in the distribution of the lumber after it is bought and in its sale, but in its manufacture from trees, create a natural suspicion of an intent to fix prices, since, under free competitive conditions, retail dealers are only interested in knowing where and how to buy the required product for the least money. And especially do such by-laws become suspicious where they further provide that "these surveys shall form the basis of service charges representing the cost of efficient distribution of lumber and other building material handled by member firms in this market, which service charge shall prevail within the jurisdiction of this Exchange," thereby making it just as obligatory upon a member to include the service charge in the cost of lumber products to consumers, when fixed by the Exchange, as it is to conform to any other rule set forth in its by-laws and penalizing non-conformance.

12. ———: ———: ———: Accomplishment. Where the articles of association, by-laws and regulations of an exchange of retail lumber dealers outline an efficient scheme for lessening lawful trade and free competition among them and non-member dealers and afford them an excellent opportunity to fix the retail prices of lumber, proof that the exchange was "designed with the view to lessen lawful trade and full and free competition" and is an unlawful combination is made by evidence that the scheme thus outlined was accomplished by adherence thereto.

13. ———: ———: Designed with View to Lessen Lawful Trade: Shown by Prior Association. Evidence that a prior association

State ex rel. Barrett v. Boeckeler Lumber Co.

among retail lumber dealers, expressly designed and carried forward for the purpose of eliminating competition, obtaining prices above the market price and selling lumber at agreed printed prices, had failed because it lacked power to punish disobedient and nonconforming members, and that the present exchange was thereupon formed, composed largely of the same members, having the same corporate powers and including all the activities of the old association and many additional ones, including power to penalize infractions of its rules and to make such activities effective and valuable to its members, is proof that the present association was "designed or made with a view" to lessen lawful trade and full and free competition in the sale of lumber by its members, and that it is a "conspiracy in restraint of trade."

14. ———: ———: Lessening Free Competition: Credits and Discounts. Credits and discounts are important elements in free competition, and an association of retail dealers in lumber which by its rules and regulations destroys or eliminates such elements is unlawful. And proof of such destruction is shown by evidence that prior to the formation of the association individual dealers, who afterwards became members, were at liberty to make such terms of sale as they pleased, and that the present association requires its members to make terms of sale at thirty days net, with two per cent discount for cash within ten days, and that for a breach of these terms a member can be punished.

15. ———: ———: ———: ———: Advancing Money: Mortgages: Uniform Manner of Deliveries. Enforced rules of an exchange of retail lumber dealers which forbid the advancement of money to contractors, even to natural customers of a member and attracted to him by his ability to render them financial assistance; and enforced rules forbidding members to take mortgages on account or to surrender a materialman's lien, and enforced rules prescribing a uniform manner of making deliveries of lumber sold, are restrictions lessening free and full competition.

16. ———: ———: Price-Fixing: Service Charge: Replacement Cost: Market Price: Sale Price. The plan used by an exchange of retail dealers for fixing the sale price of lumber was a service charge and replacement cost, "which service charge" the by-law stated "shall prevail within the jurisdiction of this Exchange." The plan ostensibly contemplated a scientific study of the cost to the retailer of handling lumber from the mills to the consumer, and an obligation upon members to add such cost or service charge, when thus ascertained, to replacement cost, leaving to the dealer the right to secure a profit out of the selling price over and above the sum of the service charge and replacement cost. The replacement cost was ostensibly the wholesale price to replace stock, be-

State ex rel. Barrett v. Boeckeler Lumber Co.

fore the dealer had been put to any expense in handling, storing, insuring, selling, billing, or collecting the sale price. The evidence showed that, for a time after the exchange was formed, a standing committee was entrusted with the duty of studying and analyzing market conditions, obtaining quotations from various wholesalers and from them arriving at the wholesale prices, and informing the members thereof; that later it was ascertained that a publication known as "Lumber" accurately reflected the wholesale prices, and thereafter members were notified of changes in such prices as were shown by this publication; that the members were required to take the wholesale price, as thus fixed or ascertained, as a basic price, and to add to it the service charge, and the result was the retail selling price; that the member was required to take the market price as thus ascertained or published as the basic price, even though he may have purchased the lumber at a less price, and was penalized if he did not take it as the basis; that the rules and by-laws did not prevent the member from selling above this wholesale price, but did forbid him to sell below the wholesale price, plus the service charge; that the wholesale prices were made up from quotations from the larger mills, but as published were often higher than those quotations, which in turn were higher than the prices of the smaller mills; that the "service charge," always added to the wholesale price and made a part of the selling price, was not an actual cost incurred by any particular dealer, but an artificial cost, claimed to be the average cost incurred by efficient dealers; that the expense of doing business varied from $6.60 to $23.37 per thousand feet, but the bids or prices submitted by different members to prospective buyers were uniform and varied not at all; that if the member did not add the service charge to his selling price, as thus fixed by the exchange, he was penalized; that to impose penalties for violating this requirement was the chief activity of the exchange, and its imposition was a stern reality; that while the exchange prohibited price-cutting between members, it permitted and approved price-cutting between members and all non-member dealers; and that ninety-five per cent of the cases in which members were fined were nominally cases for price-cutting, and less than five per cent were cases of substitution of grades, short measurements, etc. *Held*, that this, and other kindred evidence, compels the conclusion that the exchange was an unlawful pool, trust and combination in restraint of trade, designed and carried forward with the view of lessening lawful trade and full and free competition, and fixing a uniform selling price by all its members.

17. ———: ———: **Injury to Public.** Even though the evidence does not show an actual injury to the public resulted from the effective

301 Mo.—29.

State ex rel. Barrett v. Boeckeler Lumber Co.

combination among large retail dealers to fix the price of lumber, and such increase in prices may be largely accounted for by the increased demand following the World War, if the object was and the necessary effect of the combination is to restrain trade it is unlawful.

18. ———: ———: **Elimination of Dishonest Practices.** A combination among retail lumber dealers to eradicate dishonest practices and trade abuses is not unlawful or unworthy, but where the main pur-pose of calling it into existence and continuing its activities is to raise and fix prices and restrict competition, and the elimination of dishonest practices was only an incidental purpose and a mere cloak for the main purpose, it is an unlawful combination.

19. ———: ———: **Open-Price Plan.** Where the bids and sales of lumber were required to be reported to the exchange of retail dealers, but only competitors and proper officials had access to such reports, and the members were bound to charge not less than certain prices fixed by the exchange, and were penalized if they charged less, there is no room in the case for a paper "open-price plan" or "open-competition plan."

20. ———: ———: **Reasonable Restraint.** Respondents having become members of a pool, agreement, combination, confederation and understanding for the purpose of controlling and fixing the retail price of lumber and of limiting and restricting competition in the sale thereof, and it being established that such was the chief pur-pose of the organization and that they have actually accomplished such purpose, the defense that the restraint of trade accomplished thereby was not unreasonable, and that the statute should be so construed as to permit combinations and agreements which do not unreasonably restrain trade, cannot be allowed. The combination for such purpose being shown, the statute plainly makes it unlaw-ful and excludes any such defense. The statute (Sec. 9658, R. S. 1919) says that "all" arrangements, agreements or combinations "designed or made with a view to lessen, or which tend to lessen, lawful trade or full and free competition" in the sale of any pro-duct, commodity or article or to "increase, or which tend to in-crease, the market price" of any such commodity "are hereby de-clared to be against public policy, unlawful and void," and in the face of such explicit language the courts are not at liberty to ex-cept those combinations which do not unreasonably lessen com-petition or those which do not unreasonably increase prices.

21. ———: **Punishment.** In imposing punishment on the members of an unlawful combination in restraint of trade, consideration will be given to the fact that fines and conditional ouster in other cases have not prevented a recurrence or similar violation of the laws;

State ex rel. Barrett v. Boeckeler Lumber Co.

to the fact that the combination has been an instrument for the public good in some of its activities, and especially in eliminating dishonest practices; to the fact that the cost of maintaining the combination has already added materially to the burden of the consuming public; to the financial strength and amount of business done by respondents; to the extent of the activity in the combination of particular respondents; and to the fact that respondents endeavored to go as far as possible in restraining trade and fixing prices without subjecting themselves to prosecution.

*Held*, by DAVID E. BLAIR, J., in the majority opinion, and by GRAVES, J., in an opinion on motion to modify judgment, in which WOODSON, C. J., concurs, that a suspended judgment, with fines, has not proven efficacious to prevent corporations from violating the anti-trust statutes, and that the punishment should be judgment of complete ouster of all the corporate respondents of their franchises to do business in this State, and in addition a fine against each varying from $2,500 to $10,000.

*Held*, by JAMES T. BLAIR, J., in opinion on motion to modify judgment, with whom RAGLAND, WALKER and WHITE, JJ., concur, that it is irrelevant to say that judgments rendered against other corporations have not prevented violations of the statutes; that the court has never been called upon to enforce a suspended judgment of ouster heretofore rendered in similar cases, and that the punishment in this case should be the complete ouster of the incorporated non-profit-sharing exchange through which the other respondents violated the statute, and the fines mentioned in the majority opinion against said other respondents, and suspended ouster conditioned on the payment of such fines and the complete abandonment of all agreements and arrangements by them with each other to fix prices or restrict competition.

*Held*, by WHITE, J., in an opinion on motion to modify, that, owing to the peculiar language of the statutes, complete ouster might defeat its own ends, and that a more effective remedy is to keep the respondents in court, under suspended ouster, for the purpose of compelling them to abandon all violations of the law.

## Quo Warranto.

Judgment of guilty, fines and suspended ouster.

*Jesse W. Barrett*, Attorney-General, and *Merrill E. Otis*, Assistant Attorney-General, for relator.

(1) Respondents are shown by the evidence to have entered into and carried out an agreement to fix the retail price of lumber, which agreement was made with a view to lessen and has tended to lessen full and free competition in the sale of lumber, and which agreement was made with a view to increase and has tended to increase the market price of lumber, all in violation of the anti-trust statute of Missouri, whereby respondents have been guilty of illegal, willful and malicious perversion and abuse of the franchises, licenses and authorities severally granted to them by the State of Missouri, and illegal and unlawful usurpation of privileges, franchises and authorities not granted to them by the State of Missouri, for which *quo warranto* is the proper remedy, and on account of which their corporate privileges should be forfeited and adequate penalties imposed. Chap. 88, Art. I, R. S. 1919; State ex inf. v. Aetna Insurance Co., 150 Mo. 113; State ex inf. v. Armour Packing Co., 173 Mo. 356; State ex rel. v. Stock Exchange, 211 Mo. 181; State ex inf. v. Standard Oil Co., 218 Mo. 1; State ex inf. v. International Harvester Co., 237 Mo. 369; State ex rel. v. People's Ice, Storage & Fuel Co., 246 Mo. 168; State ex rel. v. Polar Wave Ice & Fuel Co., 259 Mo. 578; State ex rel. v. Arkansas Lumber Co., 260 Mo. 212; State ex inf. v. Armour Packing Co., 265 Mo. 121. (2) The "open competition plan" adopted by the respondents by itself constitutes an unlawful restraint of trade in violation of the anti-trust law of Missouri. American Column & Lumber Co. v. United States, U. S. Sup. Ct. Rep., Advance Opinions, Jan. 16, 1922, p. 150. (3) Respondents assert a principle of law stated by the Supreme Court in the Standard Oil Case, 218 Mo. 378, to the effect that "if an otherwise legal contract only incidentally limits trade or fixes prices, then that contract will not be held void on the ground that it incidentally operated in restraint of trade." They then assert that while the agreement among respondents did limit trade (restrict competition) and did fix prices, the

purpose of respondents in entering into the agreement was to eliminate their dishonest practices and not to restrict competition and fix prices, wherefore they claim to be entitled to the benefit of the legal principle stated. But have not respondents fallen into grave error here? Suppose it be admitted (and of course it is not admitted) that the motive of respondents in entering into their undenied agreement not to sell below a minimum to be fixed by the Exchange was to curb dishonest practices on their part (and that is the uttermost contention of the witnesses), their motive in entering into the agreement is a wholly different thing from the purpose of the agreement. The principle of law stated refers to the purpose of the agreement, as distinguished from the ultimate motive of those agreeing—to the purpose of the agreement as indicated by its terms and necessary and direct effect. That the respondents desired to eliminate their former dishonest and criminal methods might be conceded, but those methods, they say, were the result of ruinous, cut-throat competition. They do not pretend that they directly agreed that they would no longer resort to these practices, but they directly agreed that they would not compete by selling below a fixed price. It would be absurd to say that restriction of competition and price fixing were only incidental to such an agreement, however incidental it might be to some supposed intention back of and prompting the agreement. (4) Moreover, the Supreme Court has expressly repudiated the idea that a meritorious purpose back of an agreement to restrict competition and fix prices constitutes a defense. "It does not avail to urge that the real object was good, and that the ills .  .  . were unintentional. It is not necessary for an agreement which restrains trade to be entered into for the purpose of so doing; it is enough that the obvious and necessary effect of the agreement is to restrain trade." State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, 314; Cases cited under Point 6 herein. (5) The assumption of fact in respondents' brief that the purpose of the Exchange was the elimination of dishonest prac-

tices and not the increase of lumber prices, is not based upon credible testimony. We do not say that witnesses did not swear that that was the ultimate purpose. What we say is that such testimony, regardless of the number of witnesses giving it, is irrational and unbelievable. It may have been an incidental purpose, but it is incredible that these respondents would put up and annually expend $75,000 for the principal purpose of improving trade ethics. If there is evidence of substitution of grades and short measurements as a result of the competitive warfare of pre-Exchange days, there is also evidence of decreased profits to the dealers as a result of the same competition. These two results supplied the real motive for the expenditure by the respondents of $75,000 annually in the maintenance of their combination. (6) The anti-trust statute does not permit "reasonable" restrictions of competition or "reasonable" price fixing. On the contrary, it condemns "all" agreements which lessen or tend to lessen "full and free competition." There is nothing ambiguous about the language of the statute and no necessity, therefore, for construction. The Missouri statute recognizes no distinction between so-called "ruinous" competition and competition of any other kind. State ex inf. v. Firemen's Fund Insurance Co., 152 Mo. 1, 42; State ex inf. v. Armour Packing Co., 173 Mo. 356, 388; State ex inf. v. Standard Oil Co., 218 Mo. 1, 378; State ex inf. v. International Harvester Co., 237 Mo. 369, 392, 406, 418; State ex rel. v. People's Ice Co., 246 Mo. 168, 221; State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, 314; State ex inf. v. Armour Packing Co., 265 Mo. 121, 178. (7) Where there is no ambiguity in the language of a statute (and the Supreme Court has expressly held that there is no ambiguity in our anti-trust statute, State ex rel. v. People's Ice Co., 246 Mo. 158, 221), there is no occasion for a resort to any rule of statutory construction. State ex rel. v. People's Ice Co., 246 Mo. 158, 221; 26 Am. & Eng. Ency. Law, 598; 36 Encyclopedia of Law, 1106. (a) Even if the word "competition" has a double meaning, including both so-called "ruinous" competition and so-called "legitimate" com-

petition, and the court, reversing its former rulings, should now say that as used in the statute the word "competition" refers only to so-called "legitimate" competition, still interference with competition is only one of the prohibitions of the statute. There is certainly nothing ambiguous about the language "to fix prices" or the language "to increase prices." The respondents have violated these prohibitions as well as that against lessening competition. The prohibitions are distinct and a violation of any one is fatal. Secs. 9655, 9658, R. S. 1919; State ex rel. v. Polar Wave Ice Co., 259 Mo. 578, 607; State ex inf. v. International Harvester Co., 237 Mo. 369, 405. (8) For the purpose of the statute we need go no further than its language. Its purpose is to prevent the agreements therein prohibited, namely, "all" agreements lessening or tending to lessen competition, increasing or tending to increase prices, or fixing prices. There is no authority for the statement that the purposes of the statute are restricted to those mentioned in respondents' brief. The language of the statute is a complete refutation of the claim that it prohibits only an agreement actually enhancing prices, because it not only forbids an agreement increasing prices, but one made "with a view" to increase prices or one "to regulate, fix or control" prices and it not only condemns an agreement which does tend to lessen competition but one which was made "with a view to" lessen competition. These are separate and distinct prohibitions, to at least three of which the idea of present public injury is entirely unnecessary. (a) But if the statute should be so narrowly construed as respondents ask still the evidence shows respondents guilty because through their agreement they have substantially increased prices, driven competitors out of business or forced them to adopt the "trust" scale of prices and have established a practical monopoly.

*Carter, Collins & Jones* and *Richard L. Guode* for respondents.

(1) The cases all agree from the very first that in construing the anti-monopoly statutes, whether Federal

or State, it must appear that the agreement, pool, trust, etc., which is assailed, was made in direct restraint of trade or lessening of competition, in order for it to be invalid, and that it is not sufficient that it incidentally restrains trade or lessens competition, when the agreement, etc., was made for another and lawful purpose. In the present case, the purposes of the formation of the Exchange and of all its rules was to eliminate dishonest practices from the retail lumber business in the city of St. Louis, and to inculcate more economical methods of business. State ex inf. v. Standard Oil Co., 218 Mo. l. c. 378; Addystons Pipe & Steel Co. v. United States, 85 Fed. 275, 54 U. S. App. 727, 175 U. S. 211; United States v. Joint Traffic Assn., 171 U. S. 505, 568; Northern Securities Co. v. United States, 193 U. S. 197; Hopkins v. United States, 171 U. S. 578, 592. (2) Although the earlier decisions used language susceptible of the interpretation that, if the restraint of trade or lessening of competition the direct and not the incidental effect of the agreement assailed, then whether the restraint or lessening was reasonable or unreasonable, the anti-monopoly statutes were violated, the later decisions, after a more thorough study of the statutes and experience of their practical working, have construed away such remarks, and it is now the settled rule that only undue or unreasonable restraints of trade or competition constitute violations of these statutes. (a) Only unreasonable restraint prohibited: State ex inf. Atty.-Genl. v. International Harvester Co., 237 Mo. 369, 392; State ex inf. Atty.-Genl. v. Armour Packing Co., 265 Mo. 121, 178; Dr. Miles Medical Co. v. John D. Park & Co., 220 U. S. 373; Standard Oil Co. v. United States, 221 U. S. 1; United States v. Tobacco Co., 221 U. S. 106; Nash v. United States, 229 U. S. 373; Thompson v. Cayser, 243 U. S. 66; Cook on Combinations, secs. 118, 133 and 135; Cook on Combinations, sec. 133, p. 261, and notes; also page 214 and notes, and note 16, p. 221. (b) Statutes do not aim to preserve ruinous and unfair competition as well as reasonable and fair competition: State ex inf. v. Harvester Co., 237

Mo. 391; Board of Trade v. United States, 246 U. S. 231, 235; Federal Trade Comm. v. Gratz, 253 U. S. 421; American Press Assn. v. United States, 245 Fed. 91; Trust Co. v. Inv. Co., 248 Fed. 212; State v. Gurly, 188 Pac. 288; Vinegar Co. v. Faehrenback, 148 N. Y. 58; Hafferty v. Gas Co., 56 N. Y. Supp. 288; Oakdale Mfg. Co. v. Darst, 18 R. I. 484; Cumberland Tel. & Tel. Co. v. State, 100 Miss. 102, 113.  (3)  What is the reasonable construction of any statute? That one which tends to accomplish the purpose the Legislature had in view in enacting the statute.  To realize this purpose, the construction will be given that is in harmony with it, even if the letter of the law is the other way.  This is a cardinal rule for the construction of statutes.  Bingham v. Birmingham, 103 Mo. 352; State v. Bixman, 162 Mo. 34; State ex rel. v. Talty, 166 Mo. 529; Stubbs v. Mulholland, 168 Mo. 47; Pembroke v. Huston, 180 Mo. 627; First Natl. Bank v. Skeen, 101 Mo. 283; Ross v. Railroad, 111 Mo. 18.  (4)  What are the purposes of the statutes in question and of all anti-monopoly statutes?  Primarily to prevent injury to the public.  Injury by what means?  This court has stated them as follows:  The enhancement of prices to consumers; the driving of small competitors out of trade, and the establishment of a monopoly which results in those evils and also in deterioration of quality.  State ex inf. v. International Harvester Co., 237 Mo. 400.  See, too, the Monopolies Case, 3 Coke, 181; American Biscuit Co. v. Klotz, 44 Fed. 721, 725.  (5)  The public was not damaged, either by the rules of the St. Louis Lumber Trade Exchange, or its practices.  Prices were not raised, nor arbitrarily fixed, nor competition unreasonably restrained.  It is of the very essence of a violation of the statutes that the public should have been substantially damaged by the agreement complained of; or, at. least, that such damage is the necessary and inevitable tendency of the agreement by controlling prices, limiting production or suppressing competition.  Nash v. United States, 229 U. S. 373, 376; Thompson v.

Cayser, 243 U. S. 66, 85; Texas Standard Oil Co.
v. Adone, 83 Tex. 650, 29 Am. St. 690; Dye v. Car-
michael Produce Co., 64 Ind. App. 653; Pulp Wood
Co. v. Paper Co., 168 Wis. 400; Nester v. Brewing Co.,
161 Pa. St. 473; Homes v. Graves, 7 Bing. 743; Schneider
v. Granite Co., 187 Mo. 244, 268; 20 Eng. Law (2 Ed.) p.
849 et seq. and cases cited in notes; Cook on Combina-
tions, sec. 113, p. 261, and notes, pp. 714 et seq. and
notes and sec. 135; 19 R. C. L. p. 114. (6) Even if the
court should find there has been a violation of the stat-
utes, there has been no such transgression of the law by
the defendants, or either of them, as to warrant a for-
feiture of their charters or the infliction of penalties.
The object of forfeiting charters of corporations for
misuse or abuse of their powers is to protect the public,
and, before such relief will be granted, it must appear that
so radical a judgment is necessary to the public protec-
tion. Our statutes do not require the infliction of penalties
or the forfeiture of charters. They merely give the court
power to impose such punishments in its discretion. 22
R. C. L. sec. 47, p. 725; 27 Cyc. 907; 20 Ency. Law (2
Ed.) p. 853; Polar Wave Ice Co. Case, 259 Mo. 607; State
v. Gas Co., 153 Ind. 483, 74 Am. St. 314; and cases cited
under next point. (7) The charge in the information,
repeated in the writ, that respondents, by reason of their
participation in a pool, trust, agreement, etc., which tends
to restrain trade and lessen competition in lumber, etc.,
"have been guilty of illegal, willful and malicious per-
version and abuse of the franchises, license and authori-
ty, severally granted to them by the State of Missouri,"
and of illegal and unlawful usurpation of privileges, etc.,
not granted to them, remain not only unproved by the
evidence, but conclusively disproved. Hence, this pro-
ceeding to forfeit the charters of the defendants and in-
flict penalties upon them must fail. State ex inf. Atty.-
Gen. v. Delmar Jockey Club, 200 Mo. 346; State ex rel.
Atty.-Gen. v. Lincoln Trust Co., 144 Mo. 562, 599; State
ex rel. Atty.-Gen. v. Societe Republicaine, 9 Mo. App.
114, 119; State ex rel. Atty.-Gen. v. National School of

Osteopathy, 74 Mo. App. 439, 444; People v. Bristol, 23 Wend, 232, 236; Enos v. Hanff, 95 Nebr. 184, 98 Nebr. 245; People v. Railway Co., 125 N. Y. 513; State v. Turnpike Co., 102 Ind. 28, 33; Commonwealth v. Monongahela Co., 216 Pa. St. 108, 116; State ex rel. Atty.-Gen. v. Northern Pacific Railway Co., 152 Wis. 73, 84; State v. Birmingham Waterworks Co., 188 Ala. 388, 411; State v. Thresher Mfg. Co., 40 Minn. 213, 226; State ex rel. Atty.-Gen. v. Janesville Water Co., 92 Wis. 496, 501; Commonwealth v. Commercial Bank, 28 Fa. St. 383, 389; 14a C. J. sec. 3712, p. 1107, ᴸec. 3715, p. 1111, sec. 3719, p. 1112; Clark & Marshall on Corporations sec. 150, ρ. 427; White's Supp. to Thompson on Corporations, sec. 5824, p. 643; 5 Thompson on Corporations, secs. 6767, 6843; 10 Cyc. 1279.

DAVID E. BLAIR, J.—This is an original proceeding in *quo warranto*. On July 7, 1921, the Attorney-General filed his information which, with caption and signatures omitted, is as follows:

"Comes now the State of Missouri, by Jesse W. Barrett, Attorney-General, who in this behalf prosecutes for and in the name of the State of Missouri, and informs the court that the respondent Goodfellow Lumber Company is a corporation duly organized and existing under and by virtue of the laws of the State of Iowa; that the respondent St. Louis Lumber Company is a corporation duly organized and existing under and by virtue of the laws of the State of Maine; that said corporations are, and at all times herein mentioned were, engaged in the business of manufacturing, buying and selling lumber and are, and at all times herein mentioned were, duly authorized and licensed to do business in the State of Missouri as foreign corporations.

"Relator informs the court that the respondents Boeckeler Lumber Company, Clayton Lumber Company, Cherokee Lumber Company, Louis Essig Lumber Company, Ganahl Lumber Company, S. J. Gavin Lumber Company, Phillip Gruner & Brothers Lumber Company,

Holekamp Lumber Company, Mound City Lumber Company, O'Neill Lumber Company, Prendergast Lumber Company, H. E. Rapp Lumber Company, Julius Seidel Lumber Company, Shellabarger Lumber Company, Vandeventer Lumber Company, Wiles-Chipman Lumber Company, Wilson Land & Lumber Company, and St. Louis Lumber Trade Exchange are now, and at all times herein mentioned were, corporations duly organized and existing under and by virtue of the laws of the State of Missouri, and engaged in the business of manufacturing, buying and selling lumber.

"Relator informs the court that respondents have created, entered into, become members of and participated in a pool, trust, agreement, combination, confederation and understanding among themselves and with each other which tends to and does result in the restraint of lawful trade and full and free competition in the manufacture and sale of lumber in this State, with the purpose, design and view to regulate, control and fix the price of lumber, to maintain such price when so regulated and fixed, to fix the amount and quantity of lumber bought and sold and to lessen lawful trade and full and free competition in the manufacture of lumber in this State, all to the great detriment and damage of the purchasing public and the people of the State of Missouri.

"Relator further states that by reason of the participation of said respondents in the pool, trust, agreement, combination, confederation and understanding as herein stated, and by reason of the acts and things done by respondents as herein set forth, said respondents have been guilty of illegal, willful and malicious perversion and abuse of the franchises, licenses and authority severally granted to them by the State of Missouri, and illegal and unlawful usurpation of privileges, franchises and authorities not granted to them by the State of Missouri.

"Wherefore, the Attorney-General, prosecuting in this behalf for the State of Missouri, prays the consideration of the court in the premises, and that each respondent corporation may be excluded from all corporate

rights, privileges and franchises exercised or enjoyed by it under the laws of the State of Missouri, and that its franchise, license and certificate to do business in this State be declared forfeited, and that all or such portion of its property as the court may deem proper, be confiscated into the State, or in lieu thereof, a fine be imposed upon it in punishment of the perversion, usurpation, abuse and misuse of its franchise or license as herein described.''

On the same day this court made an order reciting the substance of the charges contained in said information and requiring respondents to appear on July 28, 1921, and show by what warrant they abuse the franchises, licenses and authority granted them by the State of Missouri and by what warrant they usurp privileges, franchises and authority not granted to them by the State and to show cause why said respondents should not be excluded from all corporate rights, privileges and franchises and their franchises, licenses and certificates to do business in this State should not be declared forfeited and judgments of fine or confiscation should not be imposed upon them. On July 15, 1921, respondents waived service of said order and entered their appearance.

On July 28, 1921, after having unsuccessfully moved to require relator to make the information more definite and certain, respondents filed their joint and several answer and return which, with caption and signatures omitted, is as follows:

''The respondents in the cause above entitled for their joint and several answers to the information of the Attorney-General of the State of Missouri heretofore filed in this court in said cause, and for their return to the order of the court to show cause why the judgment demanded by the relator should not be rendered, admit that the Goodfellow Lumber Company is a corporation organized and existing under and by virtue of the laws of the State of Iowa, and that the St. Louis Lumber Company is a corporation organized and existing under the laws of the State of Maine; admit that said two corpo-

rations are now and have been engaged in the business of buying and selling lumber, and are and have been duly authorized and licensed to do business in the State of Missouri as foreign corporations,

"Respondents admit the Boeckeler Lumber Company, Clayton Lumber Company, Cherokee Lumber Company, Louis Essig Lumber Company, Ganahl Lumber Company, S. J. Gavin Lumber Company, Phillip Gruner & Brothers Lumber Company, Holekamp Lumber Company, Mound City Lumber Company, O'Neill Lumber Company, Prendergast Lumber Company, H. E. Rapp Lumber Company, Julius Seidel Lumber Company, Shellabarger Lumber Company, Vandeventer Lumber Company, Wiles-Chipman Lumber Company, Wilson Land & Lumber Company, and St. Louis Lumber Trade Exchange are now and have been corporations duly organized and existing under and by virtue of the laws of the State of Missouri, and, excepting the St. Louis Lumber Trade Exchange, are engaged in the business of buying and selling lumber.

"Respondents deny that they or any of them are engaged in the business of manufacturing lumber.

"Respondents deny that they or any of them have created, entered into, become members of, or participated in any pool, trust, agreement, combination, confederation or understanding among themselves or with each other or among or with any two or more of them, which tends to or does result in the restraint of lawful trade or of full and free competition in the manufacture or sale of lumber in this State; deny that respondents or any of them have created, entered into, become members of or participated in any pool, trust, agreement, combination, confederation, or understanding among themselves or with each other, or among or with any two or more of them, with the design and view to regulate, control or fix the price of lumber; deny that said respondents or any two or more of them have created, entered into, become members of or participated in any pool, trust, agreement, combination, confederation or understanding to

maintain the price of lumber in this State as regulated
or fixed by respondents or any of them; and respondents
again deny that they or any of them have fixed or reg-
ulated or have attempted to fix or regulate the price of
lumber in this State by any pool, trust, agreement, com-
bination, confederation or understanding among them-
selves or any of them.

"Respondents deny that they or any of them have
created, entered into, become members of or participated
in any pool, trust, agreement, combination, confederation
or understanding with the purpose, design or view to fix
the amount of lumber bought or sold in this State, or
any part thereof, or to lessen full and free competition
in the manufacture and sale of lumber in this State.

"Respondents further deny that by reason of their
participation or the participation of any of them in any
pool, trust, agreement, combination, confederation or un-
derstanding, or by reason of any acts or things done by
respondents or any of them, as set forth and alleged in
said information, or in any other manner whatsoever,
respondents or any of them have been guilty of willful
or malicious perversion or abuse of any franchise, license
or authority granted to them or any of them by the State
of Missouri, or that they have been guilty of an illegal
usurpation of any privilege, franchise or authority not
granted to them by said State.

"Wherefore, having fully answered the information
of the relator, and shown cause why no judgment of
ouster or other judgment should be rendered against re-
spondents or any of them, respondents pray that they
may be dismissed with their costs."

On August 1, 1924, Honorable D. W. SHACKLEFORD
was appointed by this court as special commissioner to
take testimony in the case, with full power to compel at-
tendance of witnesses, production of papers, books and
other documents, to issue attachments therefor and to
hear and determine all objections to testimony and to
admit or exclude the same in the same manner as the
court might in the trial of the case before the court,

and to report the testimony and his proceedings therein to the court. After the special commissioner qualified as required by law, the taking of testimony was begun before him on September 9, 1921, and continued from time to time until same was completed, and on March 22, 1922, said special commissioner filed his report in this court, accompanied by a transcript of the evidence heard by him. The case has been briefed and argued and is thus before us for determination.

The respondents, except the St. Louis Lumber Trade Exchange (hereinafter referred to as the "Exchange") are corporations of this and other states, engaged in the retail lumber business in the city of St. Louis. The Exchange was incorporated by *pro forma* decree of the Circuit Court of the City of St. Louis, and a certificate of incorporation was issued to it by the Secretary of State on July 20, 1917. It has no capital stock, is not a profit-sharing corporation and is not engaged in the retail lumber trade. All of the other respondents are members of the Exchange and engaged in the retail lumber business in the city of St. Louis. Certain unincorporated members of the Exchange were not made parties respondent.

Prior to the incorporation of the Exchange, twenty-three lumber dealers of St. Louis had signed a memorandum of agreement for the organization of a voluntary association of lumber dealers, known as the "Lumber Dealers Association of St. Louis" (hereinafter referred to as "new association"). Most, if not all, of these signers afterwards became members of the Exchange. The constitution and by-laws of the new association were adopted as the constitution and by-laws of the Exchange, and the officers and directors of the new association became the first officers and directors of the Exchange and it assumed the obligations of the new association.

For a number of years (just how long is not clear), there had been in existence in St. Louis a voluntary association of retail lumber dealers, known as the "Retail Lumber Dealers' Association." We will hereafter refer to it as the "old association."

We quote from respondents' brief as follows:

''Said old association, according to all the testimony relating to it, was mainly an auditing body, but for a period of four months during 1912 the members of it agreed on uniform sales prices, and, becoming alarmed about the legality of that practice, destroyed the records of it. Except as regards said period of four months in 1912, so far as the evidence shows, the old association, througout the years of its life, did nothing reprehensible. Neither tried to fix prices or to limit competition. An effort was made by the State to prove the adoption by the St. Louis Lumber Trade Exchange of the constitution and by-laws of the Lumber Dealers' Association was an adoption of the constitution and by-laws of said old association, but the evidence conclusively shows the old association never had any constitution and by-laws, and that it had passed out of existence prior to the formation of the Lumber Dealers' Association in March, 1917, which subsequently became the St. Louis Lumber Trade Exchange. The old association 'had died of the dry rot,' some of the witnesses said, and others that it had ceased to function. At any rate, it had no connection with the voluntary association formed in March, 1917, as both the call for the meeting to form said new association and the memorandum of agreement signed by the dealers who went into it show.''

### CONTENTIONS OF THE PARTIES.

The contention of relator may be briefly presented by quoting a paragraph from his brief:

''From the evidence we shall show that the prime purpose of this admitted combination of the Lumber Companies was to increase retail lumber prices and thereby profits, which end the respondents designed to and did accomplish by the elimination of competition. We shall show that they were able to achieve this result by reason of a practical monopoly of the lumber business of St. Louis. We shall outline the origin of the combination, for the light it will throw on its general purposes. It

301 Mo.—30.

will appear that the present organization is but the outgrowth of an earlier association of respondents, with the same general unlawful objects. It will be pointed out how this earlier association tended to disintegrate by reason of the inadequacy of the means employed by it to stifle competition and discipline its members. What steps were taken to overcome this weakness with the re-formation of 1917 will be indicated, how withdrawal was made practically impossible, how the slightest departure from the agreement in any of its details was penalized by fines, for the enforcement of which a court and even a court of appeals were established within the organization. The elaborate machinery through which the combine functions, how one dollar at first and later seventy-five cents per thousand feet of lumber sold was added to the retail price and paid by the consuming public for the sole purpose of providing the $75,000 annual budget of the Lumber Trade Exchange will be shown from the evidence. It will be shown also that by means of their agreement to limit competition and fix prices the respondents have been able to and have mulcted the home builders and lumber users generally in St. Louis and vicinity of an amount between two and one-half million and five million dollars.''

It is the contention of respondents that there was ''the utmost good faith on the part of the Exchange and its members in all that was done by them; they acted under the advice of competent legal counsel, and endeavored earnestly to obey the law;'' that the chief purpose of the organization of the new association and the Exchange was to abolish certain trade abuses and to protect both the public and the dealers by bringing about honest methods of business; that another object of the Exchange was to disseminate information among the dealers, to educate them as to cost accounting and to introduce more efficient and economical methods and thereby reduce the price of lumber to the public. ··There was no intention to fix selling prices, *except to prevent sales below the cost of the replacement of material and the handling of the business.* There was no intention to

diminish legitimate competition or restrain trade. The evidence shows that the actual cost to a dealer of carrying on his business is difficult to figure out, and can only be done accurately by experts. Moreover, that the expense to an individual dealer of employing an expert to ascertain the cost of his business would be prohibitive." (Italics ours).

Respondents further contend that "the effect of determining the system of cost accounting in that manner was to coerce the less economical yards into introducing better and more economical methods, which resulted in lower prices to the public. A survey of the yards in order to determine the service charge was made every three months, and was based on the business of the aforesaid efficient yards during the preceding twelve months; that is to say, every three months there would be a new survey made covering twelve months down to·the date of the last survey, and leaving out the first three months of the preceding survey."

It is contended "that only by the agreement that the expense of the business be added to the cost of the material in making sales, could the trade abuses and dishonest practices be eliminated from the lumber business; that, otherwise, some dealers would sell below cost and reimburse themselves for the loss by substitution of grades, giving rebates and in the other ways we have stated."

Respondent says that "although the members were required to add the cost of the business to the cost of replacement of material in selling, they were free to add what profit they pleased. It should be stated that the requirement of the 'service charge' was not enforced after January, 1920. Certain fines were imposed after that date for violations prior to it, but all fines subsequently imposed were refunded. This was done on the advice of Mr. Collins, of counsel for the Exchange; not because he deemed the service charge unlawful (for he reiterated in giving this advice that he considered it perfectly lawful), but because he thought the members had been sufficiently educated as to the necessity, if trade abuses were to be

kept down, of adding the expense of the business to the cost of their material in selling, to no longer require the enforcement of the rule by penalties."

Respondents further say that:

"Under the rules of the Exchange, members were required to file with the Exchange their bids on lumber, and sellers were required to file reports of their sales and the prices. These estimates or bids and the sale prices were secret and not exposed to inspection by the members of the Exchange, except that, after a sale had been made, the sale prices might be examined by dealers who had competed for the bill. The objects of these regulations were the protection of the public against any mistakes in calculations or fraud in delivering the quantities and grades which had been sold. The testimony is that mistake in extensions were frequently made by dealers. For example, in bidding on so many thousand feet, at so much a thousand, errors in calculation were often detected and corrected; and the Exchange provided in its by-laws for a system of inspection, whereby if any contractor or proprietor complained of not receiving the quantity or quality of lumber bought, the Exchange sent an inspector to examine the deliveries and report in accordance with the facts.

"There were certain provisions of the Exchange which were recommended to the members as good business methods to follow, but were never enforced by the imposition of penalties. They were merely considered sound business practices. These regulations were not to extend credit for more than thirty days; not to release liens on a building until the lumber bills were paid; not to take mortgages for a bill in lieu of the statutory lien, except to secure a bad debt; not to advance money to contractors to meet their payrolls, and not to give discounts of more than two per cent for cash payment.

"A trade journal, giving quotations of wholesale prices in the lumber trade (a journal similar to those published in connection with all lines of business), was subscribed for and taken by the Exchange and by every

member of it.  The members got their information as to wholesale prices from this journal, subscribed for, as said, by them individually.  The Exchange, for the convenience of the members, sent them from time to time notices of the changes in wholesale prices; that is, the fluctuations, and this was the extent of the activity of the Exchange in that way.  The evidence shows without question that the quotations of wholesale prices in said journal, known as 'Lumber,' were reliable and accurate.  Neither the Exchange nor any member of it has any interest in the publication or ownership of this journal and no connection with it, except as a subscriber.

"The evidence shows that, instead of the Exchange or its regulations having fixed prices of lumber in St. Louis and vicinity, or having lessened competition or restrained trade, they have done neither; that they have increased competition even among the members of the Exchange.  They have accomplished this result by ridding the business of practices which often deterred dealers from competing for sales."

In brief, respondents contend that, as the result of the organization and activities of the Exchange, competition between its members and non-members has not been lessened; that prices were not fixed; that prices quoted among members varied sometimes as much as twenty-five per cent; that the use of lumber increased because of the elimination of trade abuses; that the effect of the activities of the Exchange was good.

Respondents contend (and we think the evidence so shows) that the retail price of lumber has been lower in St. Louis than in other places, particularly in territory close to St. Louis.  They contend that the rise and fall of the retail price only followed the rise and fall in wholesale prices; that building operations in St. Louis have been curtailed by demands of labor and mechanics for high wages, rather than by the high price of lumber; that during nine months of 1919 the Federal Government fixed the maximum price of lumber and respondents were not responsible for uniformity occurring during that

period; that the rise in price of lumber was general and due to World War conditions and to freight rates.

"The Lumber Trade Exchange has never included in its membership many of the retail dealers in St. Louis, but its members have constantly been in competition with non-member concerns as well as with each other.

"In their dealings with non-members, the members of the Exchange have always sold to the non-members, and at the same prices they sold to each other; not discriminating at all. The only witness who intimated to the contrary was Darlington, an enemy of the Exchange. They were advised to do this by counsel and followed the advice."

To arrive at a correct conclusion concerning the facts, we are compelled to set out much of the testimony and refer to exhibits somewhat at length. It is our duty to weigh the evidence for ourselves and make an original finding of facts, since the special commissioner had no authority to and did not make any recommendation to us concerning the facts in the case.

ARTICLES OF ASSOCIATION, RULES AND BY-LAWS.

It seems necessary to a proper understanding of the case to set out in full the articles of association and the preamble to the by-laws and the supplement thereto and to make extensive quotations from the by-laws of the Exchange. These are taken from relator's Exhibit 1, identified by President Boeckeler. There is some confusion caused in our minds by the further introduction later on in the record of articles of association, preamble and by-laws. As we understand the record, the second offering (relator's Exhibit 3) introduced in evidence earlier by-laws, and relator's Exhibit 1 covered the articles of association, preamble, supplement to preamble and by-laws in force when this suit was begun, and unless otherwise indicated herein our reference to the articles of association and by-laws is to those found in relator's Exhibit 1.

''ARTICLES OF ASSOCIATION OF ST. LOUIS LUMBER TRADE
EXCHANGE.

''ARTICLE I.

''Know all men by these presents that the persons whose names are hereto appended and their associates, constituting the present membership of the organization known as the Lumber Dealers' Association of St. Louis, do hereby associate themselves together for the purpose hereinafter named and under and by the name of the 'St. Louis Lumber Trade Exchange,' and by this name it shall have corporate succession by and through the members named herein and their associates and successors for a period of fifty years; and as such St. Louis Lumber Trade Exchange it may sue and be sued, complain and defend in any court of law or equity, have a common seal and alter same at pleasure, and receive and hold, for the purpose of its creation, property real and personal, by gift, devise or purchase, and mortgage or dispose of same by sale, lease or otherwise.

''ARTICLE II.

''The purpose of the corporation hereby created shall not be to conduct any business, whatever, for pecuniary profit, but generally to advance the commercial interests of the city of St. Louis, especially in respect to the trade in lumber and its allied products; to inculcate just and equitable principles of trade; to establish, maintain and enforce uniformity in commercial usages; to acquire, possess and disseminate useful business information; to adjust and settle in a proper and equitable manner, controversies, disputes and differences that may arise between its members, or between them and their clients; to appoint graders and inspectors of lumber and lumber products; to encourage wise and useful legislation; to protect and promote generally the interests of the lumber trade and the individuals engaged therein; and finally, to facilitate in every way possible the trans-

action of all legitimate business between members or between them and others.

"ARTICLE III.

"The corporation may from time to time, in furtherance of the purposes of its creation, make and adopt such rules, regulations and by-laws, as may be deemed needful and proper, and possess all other general powers incident to corporations of this class under the laws of this State.

"ARTICLE IV.

"The present officers and directors of the Lumber Dealers' Association of St. Louis as now constituted shall continue to be officers and directors of the corporation hereby created until, by the provisions of said rules, regulations and by-laws, the respective terms of said officers and directors shall regularly expire or be vacated, when their successors shall be elected as therein provided.

"ARTICLE V.

"The officers and directors of the Lumber Dealers' Association of St. Louis, as now constituted, and who become the officers and directors of the corporation hereby created under the rules, regulations and by-laws, are as follows:

"President ..................Richard E. Gruner
"Vice-President ..............John A. Rehies
"Treasurer ..................Louis Essig

"*Directors.*

"Adolph Boeckeler          John G. Ganahl
"Julius Seidel              Joseph O'Neil

"ARTICLE VI.

"The rules, regulations and by-laws of the Lumber Dealers' Association of St. Louis, as now constituted, shall continue to be the rules, regulations and by-laws of the corporation hereby created, until the same shall be regularly repealed or altered in the manner herein provided.

"ARTICLE VII.

"The corporation hereby created shall have no capital stock, and the custody and control of its property shall be vested in its board of directors as provided in its rules, regulations and by-laws.

"ARTICLE VIII.

"The contractual obligations of the Retail Dealers' Association, as now constituted, shall be, and are, by these articles, assumed by the corporation hereby created.

"ARTICLE IX.

"The corporation hereby created shall have power, under the rules, regulations and by-laws, as adopted, to punish any members guilty of a violation of such rules, regulations and by-laws, by a fine of not more than $500, or by suspension or expulsion, the right to a trial being always accorded.

(Signed) "President .......... Richard E. Gruner
          "Vice-President ...... John A. Reheis
          "Treasurer .......... Louis Essig

"*Directors.*

"Adolph Boeckeler          John G. Ganahl
"Julius Seidel              Joseph O'Neil

"On this 15th day of June, 1917, before me personally appeared R. E. Gruner, John A. Reheis, Louis Essig, A. Boeckeler, Julius Seidel, John G. Ganahl and Joseph O'Neil, to me known to be the persons above described, and acknowledged the same as their free act and deed.

(Signed)   "GOLDA N. DAHLING,
          "Notary Public, City of St. Louis.
"My Commission expires April 8, 1918."

"PREAMBLE"
(As Originally Adopted.)

"There is no business activity in the city of St. Louis that holds such vital relation to the community's welfare as does the retail lumber trade.

"*Assembling of Stocks.*—Due to modern building conditions the retail lumber merchant must keep in stock a great variety of the various kinds of manufactured lumber products. From every forest region of the nation he draws his supply. To meet the multiplied necessities of a great and growing community he must keep on hand a large supply of commercial sizes, and these of every grade.

"Fir, cedar and spruce from Washington and Oregon; redwood from California; yellow pine, cypress, cedar and oak from the Southern States; hemlock and hardwoods from the lake region, and other woods from distant points must be ready for instant delivery, and this from one single piece of two-by-four up to many thousands of feet.

"The modern retail lumber merchant runs a lumber product department store. His goods are open to inspection of buyer and tax collector.

"*Competitive Conditions.*—Although this merchant class is a prime need to the city's growth and progress, it labors under a ruinous handicap of competitive warfare.

"Lumber products are purchased by the dealers from the manufacturers, on an open market, at prices fixed by the law of supply and demand, with the added factor of uncertainty of car supply, and exigencies of transportation.

"Due to sharp and eager competition stocks must be maintained at the highest point in size and quality.

"*Secret Rivalry.* Although the dealers buy on an open market they are obliged to, and do, sell in secret rivalry.

"Lumber as a rule is sold at retail on estimates submitted by contractors' architects and the speculative builders. A dealer bids in ignorance of the quantity, quality or the prices quoted by his competitor. He is ever at the mercy of the buyer. Due to this situation, unfair trade practices frequently develop, with the result that the lumber merchant frequently disposes of

his stock at less than actual cost. Seldom does the consumer, himself, receive any benefit from such unnatural trade conditions. In fact the public is in no wise benefited, but quite frequently suffers loss due to the fact that the dealer, squeezed by the tricky buyer, seeks to make up his loss from ·the frank and honest purchaser. The greatest evil in the business is the furtive and secret method employed in selling lumber and in jealously guarding prices after sale. Due to this situation many evil practices have attached themselves to the lumber business, practices hurtful alike to the consuming public and trade itself.

"Rebates; short measure off grades; substitutes as to species; cut-throat prices; bitter and hurtful suspicion; lack of knowledge of trade conditions; waste and inefficiency—all are the natural outgrowth of present business methods. Public interest and trade welfare require that these conditions be overcome and eliminated.

"On every hand there is going forward a movement to correct trade abuses and to put the business of the nation on a more sane, efficient and economic basis. Those from whom lumber retail dealers must buy have organized their industrial processes, and now sell their output with full knowledge of market conditions. Notable examples are the manufacturers of yellow pine, cypress, redwood, hemlock and hardwoods.

"It is the desire of the St. Louis lumber merchants to now organize, and this to the end that trade abuses may be eliminated. In undertaking this movement it is the earnest and honest purpose of those who unite in this co-operative work to do nothing that will in the least impinge upon the prohibitions of the law, but in all things to keep themselves within its limitations. To this end the following by-laws are hereby adopted."

(Note: The by-laws then adopted have been superseded by those following "Supplement to Preamble" herein).

''SUPPLEMENT TO PREAMBLE.''
(Adopted January 14, 1920.)

''The members of St. Louis Lumber Trade Exchange, in a meeting duly called and held for the purpose of amending the by-laws and the preamble thereto, make the following declarations:

''The original preamble to the by-laws was drawn and adopted with particular reference to the retail lumber trade in the city of St. Louis; what is stated therein applies with equal force to the wholesale lumber trade, and all classes of transactions in the merchandising of lumber and its allied products, whether deliveries to purchasers are made through direct shipments from mills, or in railroad cars from the yards of the dealers, or by wagon or truck or otherwise; and what is stated therein also applies with equal force in the entire territory of what may be termed 'Greater St. Louis' as distinguished from the city of St. Louis as confined by its corporate limits, and by which is meant the industrial territory composed not only of the city of St. Louis, but also the counties, cities and towns which are nearby or contiguous thereto, and which are served by the lumber merchants of St. Louis and of such industrial territory.

''The experience of the Exchange has demonstrated clearly that the interests of the lumber trade and of the public will be better served by amending the by-laws to permit admission to membership in the Exchange of lumber merchants engaged in business anywhere within the larger industrial territory of 'Greater St. Louis.'

''Accordingly, the members of the St. Louis Lumber Trade Exchange do hereby re-affirm and approve the principles expressed in the original Preamble as having a wider territorial application and as being applicable to transactions of every kind where sales of lumber and allied products are made to the consumer, without respect to the method employed of making delivery.

''The constitution and by-laws of the Lumber Dealers' Association of St. Louis having heretofore been repealed and other by-laws adopted, the following by-laws

for the government of the St. Louis Lumber Trade Exchange are now hereby adopted, any portion or portions of former by-laws inconsistent herewith being hereby repealed."

Article I, section 1 of the by-laws prescribes qualifications of members and admission to membership on majority vote of the board of directors. It provides for a membership fee of one thousand dollars and acceptance by the member of the by-laws, rules and regulations of the Exchange.

Section 3 makes attendance of the member or alternative representative (provided for in section 2) compulsory at all regular and annual meetings, under penalty of such fine or other disciplinary action as the board of directors may prescribe.

Section 4 provides for resignation of members, but it takes six months for a member to get out of the organization, during which time all dues, fines and assessments must be paid. The six months period was fixed, as suggested by General Boyle, for cooling time and to give the member opportunity to change his mind.

Section 5 authorizes expulsion of members on two-thirds vote of the entire board of directors, with forfeiture of membership.

Article II is devoted to the rules governing membership meetings.

Article III, section 1, provides that each member of the Exchange shall pay as monthly dues a sum equal to one dollar on each one thousand feet of lumber (or its equivalent in other merchandise) sold during each preceding month in the territory in which the Exchange functions for the purpose of operating the Exchange and carrying forward its work, "particularly along the lines of education, publicity and other activities of benefit to the lumber trade and to the community." (NOTE: The dues were later reduced to seventy-five cents per thousand feet).

Article IV covers the subject of nominations and election of officers, and throws no particular light upon the character of the Exchange or its activities.

Article V, section 1, vests the government and powers of the Exchange in its board of directors, except only as to powers vested in the board of arbitration and board of appeals.

Sections 2 and 3 prescribe the powers and duties of the board of directors. Among other things: "it shall judge of the qualifications of any person applying for membership after having considered. the report of the membership committee. It shall have supervisory control and direction over the management and affairs of the Exchange except as otherwise provided in these by-laws. It shall determine the policies of the Exchange. Its judgment shall be final as to what fund or funds may or shall be accumulated and how it shall be applied to the work of the Exchange, particularly along the line of education, publicity and other activities of benefit to the lumber trade and to the community. It shall generally do such other proper, useful and needful things as in its judgment may tend to promote the usefulness of the Exchange and carry out the purposes of the organization." The remainder of Article V is devoted to meetings of the board, quorum, time and place thereof, vacancies, etc.

Article VI deals with officers and their duties. Among the duties of manager, it is prescribed that "he shall keep the records and reports of all cases before the board of arbitration and the board of appeals; he shall cite persons to appear and give testimony in such cases; he shall conduct correspondence of the Exchange and shall perform such other duties as the directors from time to time may prescribe."

Article VII is entitled "Arbitration." Sections 1 and 2 provide for the qualifications of six members of the board of arbitration, its organization, rules, presiding officer, etc. Section 3 covers the manner of filing charges against members for "default, misconduct or offense, in violation of the by-laws or rules of the Exchange." Section 4 provides for the procedure in trials, and authorizes trial in the absence of the "defendant." Sec-

State ex rel. Barrett v. Boeckeler Lumber Co.

tion 5 authorizes suspension of, or imposition of penalties upon, any duly notified member neglecting or refusing to appear and testify at any hearing or refusing to answer questions deemed to be proper by the board of arbitration. Under this section a defendant apparently can be compelled to testify against himself. Sections 6, 7, 8 and 9 provide for notice of the suspension of the member, reinstatement, rehearings and for right of appeal (not unlike proceedings in court).

Article VIII creates a board of appeals, independent of the board of arbitration, for its organization, rules, disqualification of its members and vacancies therein. Its procedure is prescribed in a subsequent article.

Article IX covers the subject of payment of fines and penalties.

Article X deals with the rules governing conduct of trials. It is unnecessary to go into details. It provides for testimony under oath by witnesses. Hearsay testimony may be admitted if deemed to be in the interest of justice and to be reliable. No accused person can be represented by an attorney at law. Decisions of the board of arbitration must be in writing and filed with the manager of the Exchange.

Article XI specifies the different committees and defines their duties. Such committees include executive-membership, auditing and finance committees, with duties ordinarily common to such. In addition, section 7 provides for the appointment of a number of standing committees, named by the president. They include committees on "civic welfare," "trade ethics," "market conditions," "cost accounting and standardization of methods," "credits," "standards of credits," "labor conditions," "entertainment" and "education."

No good purpose can be served by setting out the duties of all the standing committees. Only those deemed of interest or importance in determining the issues before us will be noticed.

The committee on cost accounting and standardization of methods is charged with the duty of undertaking

"the study and analysis of scientific cost data in order that the members may adopt at the earliest possible moment a standard method of accounting for the purpose, not only of educating the members in the results of their own operations, but to facilitate, also, the important functions of co-operative trade research. This committee shall make investigation as to the efficiency of methods prevailing in this market as regards the services rendered the buying public, in order that, through the medium of co-operative study, the members of the Exchange may improve their facilities and an efficient and economical standard of service may be established.

"The committee on credits shall devote its efforts to a careful study of the general principles of credit, and the investigation of credit conditions in this market as applied to the building material trade. It shall also undertake such other important functions in the matter of credit control as the board of directors may, from time to time, provide."

The standing committees are charged with the duty of preparing monthly and annual reports showing the results of their activities.

Article XIV on "trade ethics" is quoted in full:

"*Whereas,* for years past, many practices, inimical to the best interests of the trade, as well as to the public generally, have developed; and

"*Whereas,* such practices tend to create distrust and suspicion among dealers in lumber products and in the minds of the consumers of such products, and in the minds of the public; and

"*Whereas,* this condition has seriously interfered with the efficient and economical distribution of lumber products in this market; and

"*Whereas,* it is the chief object of the Exchange to inculcate just and equitable principles of trade, now, therefore,

"Be it resolved, That this Exchange condemns all such pernicious practices, and in particular:

"1.   Substitution of inferior grades.

"2.   False tally, or measurement.

"3.   Submission of fictitious bids or estimates.

"4.   Collusion with contractors, buyers, competitors or others, for the purpose of suppressing honest, open competition.

"5.   Conduct tending to discredit competitors in the minds of the purchasers of lumber products.

"*Unethical Trade Practices Forbidden.*—To the end that such evils may be eliminated from this market, and in order that this Exchange may effectively insure upright conduct at all times, on the part of its members in their relations to competitors and to the consumers of lumber products, the following sections are hereby adopted:

"Sec. 1.   *Substitution of Grades.*—Any substitution of grades, without knowledge and consent of the purchaser, is positively prohibited.

"All grades shall be specifically indicated when submitting bids or estimates.  Failure on the part of the prospective purchaser to mention grades, when inquiring for quotations, shall not entitle the bidder to disregard this section.

"Sec. 2.   *Fictitious Bids.*—Every bid or estimate, made by a member of this exchange, shall be submitted in good faith, and with the full intention of complying, in every respect, with the terms of such bid, or estimate, in the event said member may be awarded the business. The submission of fictitious or straw bids, or any other secret agreements with prospective purchasers for the purpose of obtaining an unfair advantage over competitors, is prohibited.

"Sec. 3.   *Secret Rebates.*—The practice of giving commissions or secret rebates to contractors or buyers or others interested directly or indirectly, in the purchase of lumber products, is contrary to the principles of the Exchange and is forbidden.

"Sec. 4. *Solicitors.*—All salesmen or solicitors employed by members of this Exchange, shall be governed by the rules of this Exchange.

"Sec. 5. *Principal Responsible for Employees.*— Members shall, under the rules and regulations, be responsible for the acts of their salesmen, solicitors or other employees or their representatives. (See also Article I, Section 2).

"Sec. 6. *Interference With Closed Sales.*—No member of this Exchange, taking advantage of a lowered market, or other causes in his favor, shall after business has been placed with a competitor, solicit or otherwise seek to take away such business from the same competitor.

"Sec. 7. *Upright Conduct.*—In order that the principles represented by this Exchange may command the respect and appreciation of the community, it devolves upon all members at all times to conduct themselves in their relations to their fellow-members in a fair and upright manner. No exceptions to this rule can be tolerated.

"Sec. 8. *Grievances.*—It shall be the duty of every member to report, without delay, all grievances to the manager, in order that prompt action may be taken to avoid a repetition of the evil, or that an accused member may be given the opportunity of vindicating himself.

"Sec. 9. *Violation of Rules.*—All illegal or otherwise unfair practices affecting the lumber trade in this market, coming under the observation of members, shall be reported promptly to the manager.

"Sec. 10. *No Advance of Money, Etc.*—No member of this Exchange shall advance moneys for payroll, or other purposes, to any contractor or others. Nor shall any member go on the bond of such contractor or customer.

"Sec. 11. *Mortgages.*—Members of this Exchange shall not accept mortgages on account; provided, however, that nothing in this section shall be construed as prohibiting the acceptance of mortgage security as protection against loss on a doubtful account.

"Sec. 12. *Security.*—No member of this Exchange shall surrender his lien security, nor execute satisfaction of such a claim, without payment in full óf the account thereby secured, or the substitution of security equally as good; provided, however, a member may release or relinquish his lien rights in a bona-fide settlement of doubtful claims.

"Sec. 13. *Bad Accounts.*—It shall be the duty of every member to report monthly to the manager of the Exchange any failure to secure satisfaction in full on an account. A record of all such transactions shall be kept by the Exchange for the future protection of members.

"Sec. 14. *Provisions for Enforcement.*—Any member or employee of such member, who shall make any false or misleading report or answer to this Exchange, or who shall have recourse in any manner whatsoever to methods, directly or indirectly, in violation of, or contrary in purpose or effect to, the spirit of the foregoing rules, at the discretion of the board of arbitration, may be fined, publicly reprimanded or suspended. Any one or all of the foregoing penalties may be imposed at the discretion of the said board of arbitration."

Article XV is as follows:

"Sec. 1. *Contracts.*—No contracts shall be recognized as such by this Exchange, unless they are in writing and signed by the parties thereto.

"Sec. 2. *Copies Filed.*—In every case where member firms enter into contracts, per thousand feet, for future delivery, copy of such contracts properly executed in writing, showing schedule of prices agreed upon and accepted, must be filed with the manager on the date the engagement is entered into, and subsequent deliveries thereon must be reported on sale cards showing items and amounts and giving definite reference to the contract in question."

Article XVI on "estimating" is deemed of sufficient importance to be set out in full:

"Sec. 1. *Intelligent and Legitimate Competition.*— The vital force of economic development is intelligent competition. To promote fair, open, constructive competition among the factors engaged in the St. Louis lumber trade' is a chief purpose of this Exchange. And, in order that higher and more efficient standards of competition may prevail in this market, the following rules governing the submission of estimates, are hereby adopted:

"Sec. 2. *Estimates.*—The word 'estimates' shall be considered to mean a quotation on one or more items of lumber, millwork or allied products.

"Sec. 3. *Estimates on Forms Preserved.*—A carbon copy free from alterations on all estimates amounting to fifty dollars or over, shall be mailed to the manager within twenty-four hours after receipt of inquiry, together with a white filing card used for this purpose.

"*Figuring Estimates.*—When it is impracticable to forward copy of estimate within the time specified, a white filing card shall be properly filled out and mailed at once to the manager, accompanied by a satisfactory explanation of the delay in submitting copy of estimate.

"Sec. 4. *Duration of Estimates.*—As a protection to the prospective purchaser all estimates shall continue open for acceptance for a period of ten days. Should application be made by a customer for an extension of time for his acceptance, it may be granted for a further period of ten days, provided the manager is notified at once in writing of such time extension.

"Sec. 5. *Millwork.*—Where an estimate includes one or more items of millwork or merchandise, other than lumber, such items shall be quoted on separately, and if the estimate is required to be submitted in the form of a lump bid the total of all items, other than lumber, shall be given at the bottom of estimate separate from the lumber bill. Exception, however, may be made in the case of stock items of millwork or other merchandise regularly carried by retail yards, in which instance such items may be figured in the body of the bid.

"Sec. 6.  *Specifications.*—Estimates shall clearly show attached to each item a standard grade designation, recognized by this Exchange.  (See Article XVII, Section 2).

"Sec. 7.  *Alternates.*—The value of lumber for building purposes has been greatly minimized in the minds of consumers through the practice of inducing uninformed buyers to accept alternate quotations on grades and species inferior to those originally specified.  This practice tends to keep down the standards of quality below the margin of efficient utility, and is in direct conflict with the purposes of the Exchange.  Therefore, that the interests of the consumer, as well as of the trade, may be effectively safe-guarded in this respect, the following rules are hereby adopted:

" (a)  *To Estimate What Buyer Calls For.*—All items in estimates must be figured according to the buyer's specification.

" (b)  *Quotations on Options.*—Suggestion as to changes in specifications must be in the form of alternates, plainly written on both the original estimate and on the copy sent to the Exchange.  (See Article XVII, Section 2).

"Sec. 8.  *Reporting Sales.*—All sales based on estimates or quotations including direct sales of fifty dollars or over, must be reported to the manager within twenty-four hours after sale has been made, on standard red sales card, and all spaces must be filled in.

"Sec. 9.  *Changes in Items.*—All changes made in estimates whether authorized by customer or through error or omission, must be reported on the same date such changes are made, using standard yellow card provided for that purpose, and all spaces must be filled in and sufficient data given to clearly explain the said changes."

Article XVII deals with "grades and symbols." It is an important article, but we think it does not shed any particular light on the issues here involved.

Article XVIII, covering "inspection," is as follows:

"In order that the Exchange may insure strict adherence on the part of its members, to the standard of grades, hereinbefore designated, and in order that consumers of lumber in this market may be afforded means of securing equitable settlement of any claims against members arising through questions of grade or dimension standards, this Exchange through its manager will, upon receipt of a request in writing setting forth the circumstances of such claim, provide an official inspection of the material in question. In all such cases the inspector's report shall be considered final. If five per cent or more of the material inspected is found to be off grade, the total cost of the inspection shall be borne by the member concerned, otherwise the cost of inspection will be assumed by the Exchange."

Article XIX is entitled "service" and reads:

"It is essential, in order intelligently and fairly to comprehend the basic principles underlying production and distribution of a commodity, that a study of actual conditions relating thereto be instituted; such a study of facts from scientific and impartial attitude will, of a certainty, reveal the weaknesses as well as the strength of any system of distribution, thus affording protection to the public, the investor, producer, distributor and consumer. The perpetuation of legitimate competition in trade requires the setting forth of all moral as well as all immoral situations as they may appear in order that evil may be eradicated and the good conserved.

"Fundamentally, a correct knowledge of service cost is most necessary; therefore this Exchange, through its board of directors, shall from time to time institute comprehensive, economic surveys to be conducted by competent experts. *These surveys shall form the basis of service charges representing the cost of efficient distribution of lumber and other building material handled by member firms in this market, which service charge shall prevail within the jurisdiction of this Exchange.*

"The detail of figures covering the service charge is not here set forth, and this because of the necessity of changes up or down, as the case may be, occasioned by the increased or lowered cost of handling lumber products in this market. We have above stated, however, the broad principles as to the service charge under which this Exchange operates." (Italics ours.)

Article XX deals with "credits" and is set out in full:

"*Whereas*, It is deemed advisable to improve credit conditions in this market, especially in the interest of the members of this Exchange,

"*Be it Resolved*, That the following terms of sale shall prevail in this Exchange:

"Section 1. *Terms of Sale.*—Terms of sale shall be thirty days net. After sixty days unpaid accounts become delinquent, and subject to a five per cent interest charged, to be computed monthly.

"Sec. 2. *Notice of Terms.*—Every member of the Exchange shall cause these terms to be clearly shown on all estimates, invoices and statements covering transactions coming under the rules of this Exchange.

"Sec. 3. *Cash Discounts.*—On all sales made by the members of the Exchange, a two per cent discount may be allowed for payment on or before the 10th of the month following delivery. This discount is also to apply on deliveries on contracts, such deliveries to be charged as they are made.

"Sec. 4. *Estimates to Show Gross Price Only.*— It shall be the duty of every member to report promptly to the manager's office any failure to secure satisfaction in full of an account. A record of all such transactions will be kept by the manager for the future protection of members."

Article XXI provides for a corporate seal.

Article XXII is as follows:

"BY-LAWS AND RULES; PROMULGATION.

"*Promulgation of By-Laws and Rules.*—The manager of the Exchange shall provide every member with

one or more copies of the articles of incorporation and by-laws and a copy of subsequent rules and rulings, *and no member shall be allowed to plead ignorance of the same in mitigation of an offense.''* (Italics ours.)

APPLICABLE STATUTES.

The information is based on Chapter 88, Article I, Revised Statutes 1919. Section 9655 is as follows:

"Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this State, or any article or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in this article.''

Section 9656 is as follows:

"Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation, or understanding with any other person or persons to regulate, control or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience or repair, or any product of mining, or any article or thing whatsoever, of any class or kind bought and sold, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed, or shall enter into, become a member of or participate in any pool, trust, agreement, contract, combination, confederation or understanding, to fix or limit the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever of any class or kind bought and sold, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and be punished as provided for in this article.''

Section 9658 is as follows:

"All arrangements, contracts, agreements, combinations or understandings made or entered into between any two or more persons, designed or made with a view to lessen, or which tend to lessen, lawful trade, or full and free competition in the importation, transportation, manufacture or sale in this State of any product, commodity or article, or thing bought and sold, of any class or kind whatsoever, including the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, and all arrangements, contracts, agreements, combinations or understandings made or entered into between any two or more persons which are designed or made with a view to increase, or which tend to increase, the market price of any product, commodity or article or thing, of any class or kind whatsoever bought and sold, including the price or premium to be paid for insuring property against loss or damage by fire, lightning, or storm, are hereby declared to be against public policy, unlawful and void; and any person or persons creating, entering into, becoming a member of or participating in such arrangements, contracts, agreements, combinations or understandings shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and punished as provided for in this article "

Section 9666 is as follows:

"The words person or persons, used in this article, shall be deemed to include natural persons, partnerships, associations of persons and corporations created or organized by or under the laws of this State, or under the laws of any other state or country."

### NATURE OF THE ISSUES INVOLVED.

The issue tendered by the information and the joint and several answer and return is one of fact and whether such facts bring the activities of the Exchange within the inhibition of the foregoing sections of the statute.

Information. The sufficiency of the information to charge a violation of our anti-trust statutes was

challenged, but we do not think it is seriously challenged, in view of our previous decisions on the point. Respondents do not press such challenge in their brief. An information in practically the same form was held good in the absence of timely motion to make more definite and certain in State ex inf. v. Arkansas Lumber Co., 260 Mo. 212. Such motion was filed and overruled before return in this case and the information thereby held to be sufficient.

Respondents now meet the issue of fact squarely and have not sought to parry such issue by pleas of unconstitutionality, misjoinder of parties, statutes of limitations, claims of right to jury trial, etc., which are found in so many of the so-called trust cases previously before this court.

### GENERAL DISCUSSION OF THE PLAN OF THE EXCHANGE.

It is readily seen from the scheme provided for in the articles of association, preamble to the by-laws and supplement thereto, and especially from the by-laws themselves, that the Exchange is at least admirably designed to be employed for the purpose of fixing retail prices of lumber sold by the members of the Exchange, who are respondents herein, and of greatly lessening competition therein.

The object and purpose of the Exchange are squarely set forth in article II of the articles of association, which we have above quoted. Nothing objectionable is therein set forth, although the words ''to protect and promote generally the interests of the lumber trade and individuals engaged therein'' are certainly broad enough to include among the *stated* charter powers of the Exchange the making and entering into such agreements and understandings as are alleged in the information to have been made and entered into by the members of the Exchange.

Article IX empowers the Exchange to punish members guilty of violations of the rules and regulations or by-laws by a fine of not more than five hundred dollars or by suspension or expulsion.

The ruinous handicap of competitive warfare is deplored in the preamble; we agree that "rebates; short measures; off grades; substitutes as to species; cut-throat prices; bitter and hurtful suspicion; lack of knowledge of trade conditions; waste and inefficiency" are undesirable and that public interest and trade welfare require their elimination. But surely a commendable movement for the lessening and elimination of such conditions does not require a solemn declaration that "it is the earnest and honest purpose of those who unite in this co-operative work to do nothing that will in the least impinge upon the prohibitions of the law, but in all things keep themselves within its limitations." Rather does not such declaration indicate a fear that the very articles and by-laws themselves may leave quite the contrary impression in the public mind?

The by-laws fix the membership fee at one thousand dollars, a sum large enough in itself to give pause to a member when contemplating withdrawal. We have found no provision for the withdrawal of the membership fee. In case of withdrawal or expulsion of the member, the membership fee could doubtless be forfeited. The record leaves it uncertain whether this fee was in fact forfeited upon completed withdrawal from the Exchange. In the case of the Fred Heim Lumber Company the unpaid notes covering three-fourths of the membership fee seem to have been returned after some controversy. Apparently an expelled member must pay the membership fee again if he is reinstated, for article I, section 5, of the by-laws provides that upon readmission he must comply again with the requirements of section 1 of such article, among which requirements is the payment of the membership fee of one thousand dollars.

To create a fund to carry on the activities of the Exchange monthly dues in the sum of one dollar, and later seventy-five cents, on each one thousand feet of lumber, or its equivalent in other merchandise, are required in the by-laws. It is readily apparent that even the seventy-five-cent rate would naturally produce a

large sum for that purpose. Adolphus Boeckeler, Vice-president of respondent Boeckeler Lumber Company, and president of the Exchange when the hearings were held, testified that the total annual income of the Exchange was approximately $75,000. This was at the time testimony was being taken and under the dues collected at seventy-five cents per thousand feet. There appears to be no question concerning the substantial correctness of Mr. Boeckeler's estimate. A fund of such dimensions is a very large one for the activities required in the commendable business of education of the members of the Exchange and inducing them by moral suasion to desist from dishonest and unethical practices.

Article XI, sections 12 and 13, of the by-laws, prescribe the functions of the standing committees on cost accounting and standardization of methods and on credits. The former is charged with the duty of studying and analyzing "scientific cost data." The stated purpose is that the members of the Exchange may adopt at the earliest possible moment a standard method of accounting, not only for the education of the members in the results of their own operations, but to facilitate the important functions of co-operative trade research. Not a hint of anything improper in all this. It is only when the functions of this committee, taken in connection with the survey of competent experts and the provision for compulsory application by a member of the Exchange of a service charge (provided for in Article XIX), are taken into consideration, does the possibility, yes, probability, of impropriety appear.

The same may be said of the functions of the committee on credits. That committee is not only charged with the duty of studying credit conditions as applicable to the St. Louis lumber trade, but it was required to "undertake such important functions in the matter of credit control as the board of directors may from time to time provide." The study of credit conditions is innocent enough but when the Exchange undertakes to *control credits* among its members, the understanding

invades at once a very important field of full and free competition.

Article XIV is devoted to the subject of "trade ethics." Many of the practices denounced in this article are thoroughly reprehensible. Some of them, if practiced by a dealer, might well be redressed by legal action, and doubtless by criminal prosecutions, independent of their inhibition by the Exchange. But by what right or reasoning, except the compelling one of an illegal understanding, can the Exchange govern the activities of salesmen and solicitors working in the employ of members, as prescribed by section four? How can the Exchange render illegal the effort of competitors to secure business apparently belonging to another dealer, prior to the closing of a binding contract, as such right is apparently asserted in section six? By what authority, except the restraining influence of an air-tight combination with anticipated penalties of fine, suspension or expulsion, can the Exchange deny to the dealer the right of a free competitor to advance money to a contractor for any legitimate purpose, to take a mortgage on account or to forego his lien if he wishes? Yet, for such conduct the member is subject to fine, public reprimand or suspension in the discretion of the board of directors. Respondents contend that such penalties were never imposed, but the power is lodged in the Exchange to impose them.

Article XV covers the subject of "contracts"—contracts between a member of the Exchange and his customer. Contracts for future delivery must be in writing and signed by the parties. Copies thereof must be immediately filed with the manager of the Exchange and delivery thereunder must be reported to him specifically. Is this provision harmless and solely for the enlightenment and education of the members as to prevailing prices or of protecting the members and customers against mistakes? Is it not of vastly greater value in checking up the business of the members competing for the particular business to see that they do not cut prices?

It must at least be admitted that the requirement is entirely serviceable for the latter purpose.

Article XVI deals with the subject of estimates on lumber and lumber products which have not ripened into contracts. Here also the inquisitorial eye of the Exchange is all-seeing. It is asserted that knowledge of estimates and actual sales made by the dealer member must be afforded the Exchange in order to guarantee *intelligent* competition. No intimation is made in words in the by-laws that such knowledge will be used to penalize the member making the estimate or consummating the sale if he dares to quote or sell at too low a figure. But is not the certainty of the imposition of the penalty spoken clearly in the by-laws?

Article XIX makes provision for the service charge. It first recites the necessity for the study of the basic principles underlying production and distribution of the commodity. What retail dealers have to do with, or how they can reduce the cost of, production of lumber, that is, the cost of felling the trees and manufacturing them into lumber, is not suggested. If lumber is produced under free, competitive conditions, retail dealers are only interested in knowing where and how to buy the required product for the least money. How to reduce the cost of distribution, that is getting the product into the hands of the consumer thereof, is, of course, a most valuable study for any dealer. The knowledge of such means is beneficial to a dealer and its benefit presumably will be shared with the consumer. But when the Exchange undertakes to fix and to force upon the dealer an arbitrary service charge or cost of doing business from the producer to the consumer, even though such service charge be the average cost incurred by efficient dealers, the suspicion of an intent to fix prices is a natural one, to say the least.

Article XIX also provides that "these surveys shall form the basis of service charges representing the cost of efficient distribution of lumber and other building ma-

terial handled by member firms in this market, *which service charge shall prevail* within the jurisdiction of this Exchange.'' In other words, it is just as much obligatory upon a member of the Exchange to include in the cost of lumber products to the consumer the service charge, when fixed by the appropriate authority of the Exchange, as it is to conform to any other rule set forth in the by-laws. Penalties for non-conformity or disobedience may be imposed in like manner as for violation of any other rule.

What are the elements which go to make up the selling price to the consumer? First, original cost to the dealer; second, cost of handling by the dealer; third, profit to the dealer. It is apparent that the dealer cannot continue in business unless the selling price at least equals the first two elements, and it is equally apparent that he cannot prosper in business unless such selling price includes all three elements. The dealer is entitled to charge the consumer a price sufficient to cover the original cost to him and expenses necessarily incurred by him in getting the commodity into the hands of the consumer, plus a reasonable profit sufficient to induce such dealer to remain in business. When the price to the consumer is determined by free and open competition, no just complaint can be lodged against the dealer, no matter to what heights prices soar. Such is trade honestly and fairly conducted.

We have somewhat at length set out parts of the articles of association, preamble and supplement thereto and the by-laws and the meaning thereof as it appears to us. Taken altogether they constitute a scheme of government which is complete in itself within the field in which it operates. The scheme comprises a constitution and laws, a trial court and court of appeals, fines and penalties. It is in harmony with the State and Federal governmental schemes in providing that ignorance of the law is no excuse. But unlike those admirable schemes, it provides for trials in the absence of the accused and authorizes convictions upon hearsay evi-

dence, save only when such hearsay evidence is not deemed reliable. The scheme authorizes the Exchange to impose fines, public reprimands, suspensions and expulsions.

We have thus elaborated upon the scheme for the purpose of showing that the instrument—the Exchange —used by respondents is admirably adapted to serve the very purpose which relator charges it was used for, to-wit, to fix and maintain the price of retail lumber in St. Louis and vicinity and to limit competition. The scheme as thus outlined afforded an excellent opportunity to respondents to accomplish the doing of the things charged against them.

It is the contention of relator that the Exchange fixed the selling price by use of the device of disseminating among its members information of an assumed and not always actual original cost and an ascertained service cost and that the sum of these two constituted the selling price and that a profit was included in one or the other, or both; that all members were required to sell for not less than the sum of these two elements and by such means respondents fixed prices for their commodity; that in fact the selling price was uniformly the wholesale price, either as fixed by the committee or as ascertained from the trade publication "Lumber," plus the service charge as fixed by the Exchange; that such conduct constitutes a violation of our statutes, forbidding and penalizing agreements in restraint of trade.

### THE REAL PURPOSE OF THE EXCHANGE.

As we have already seen the Exchange furnished respondents the opportunity to fix the price of lumber. We might, perhaps, be justified in stopping here and concluding that respondents are shown by their own written agreements to be guilty of the charge of creating, entering into and becoming members of and participating in a pool, trust, agreement, combination, confederation and understanding among themselves which tends to result in the restraint of lawful trade and full and free competition in the sale of lumber in this State,

as charged in the information; that the showing made by these instruments alone is sufficient to constitute the quantum of proof required of relator. But there is abundant proof of actual restraint of trade. Section 9658, Revised Statutes 1919, declares that persons who enter into agreements, combinations, understandings, etc., *"designed or made with a view to lessen, or which tend to lessen,* lawful trade, or full and free competition'' in the sale of any product, commodity or article ''shall be deemed and adjudged guilty of a conspiracy in restraint of trade.'' The articles of association, preambles and by-laws of the Exchange clearly are designed to accomplish restraint of trade and if enforced clearly *tend* to that end.

There are strong circumstances outside of the articles of association and the by-laws which convince us that the Exchange was formed ''with a view'' to lessen lawful trade and full and free competition. As heretofore seen, an association of lumber dealers, known as the Retail Lumber Dealers' Association, which we refer to as the old association, had been formed a number of years prior to the formation of the new association. It functioned more or less unsatisfactorily for a number of years. It is admitted by respondents that ''for a period of four months during 1912 the members of it agreed on uniform sale prices and, becoming alarmed about the legality of that practice, destroyed the records of it.''

John B. Kessler, a former secretary of the old association, testifying in relation to the four months of price fixing by the old association, and the burning of the records thereafter, said:

''Q. How did you come to take them out to his place to burn them? A. They were so ordered.

''Q. By whom? A. By the Association.

''Q. For what reason? A. On motion of some one —I don't know who.

''Q. And how much was destroyed at that time? Just what did that motion include of the subjects to be

burned? A. Well, the records that pertained to a certain little four months' combination they had on.

"Q. What do you mean by 'four months' combination?' A. Well, it lasted four months. It was a 'gentlemen's agreement' to raise the prices. They made a new list.

"Q. What four months were those? A. Oh, I don't remember; they were—

"Q. Do you remember what year? A. 1912, I believe.

"Q. Up to the time of that four months' agreement was it compulsory for the various members to follow the printed price list which they were using? A. No, sir.

"Q. Was there any change in 1912 as to making this compulsory? A. Well, they all claimed they were getting too little money for their lumber and competition was fierce and they were all cutting prices so much that they needed something of the kind, and they agreed to raise the list, which they did, and that started in on a 'gentlemen's agreement,' and we kept a record of all the bids that were submitted.

"Q. Now, what happened during that four months with regard to raising prices? A. In what way do you mean what happened?

"Q. Were prices raised during the four months? A. Yes, sir; they were raised three different times; once when we started and twice after that."

Mr. Kessler's testimony tended to show that the old association at all times promulgated lists of retail prices for the use of its members. We quote from his testimony:

"GENERAL BARRETT: They had a list of prices then? A. Always had a list.

"Q. And that list was prepared, you say, by a committee? A. Always by a committee.

"Q. Of the Association? A. Of the Association.

"Q. In what manner did the committee prepare that list? How did they obtain the data? A. They would meet there and compare the wholesale price; that

is to say, they ought to get above the wholesale price about so much. Now, about what that is, of course, that varied.

"Q. They would discuss wholesale prices; is that right? A. Yes, sir.

"Q. And then what would they do? A. Well, they would probably appoint a committee to revise the list.

"Q. Revise the wholesale prices? A. No, the retail prices. It was a retail list.

"Q. They made up then the retail price, did they? A. Yes, sir.

"Q. What did they do with that list when it was made up? A. Well, they had several thousand of them printed. One yard would take as many as they thought they had places for, or customers; might be a hundred; some would take more; some would take up into a thousand, or two thousand. I have had two thousand printed for some of them.

"Q. Were those lists which they took identical for different yards? A. Possibly one or two exceptions. Where one probably might object, he would say, to the low price of a single item on the list, they gave him permission to raise that if he chose to, but not lower.

"Q. Would he use one of those lists with the corrections noted? A. Yes, sir.

"Q. Or would he have an entirely different list? A. No. His list would be the same as the others, but he might have an item of flooring that he felt they were not asking enough for, and he would probably add a dollar or fifty cents.

"Q. And he might complain, on the other hand, because some of the prices were too high and he wanted to sell for less? A. Well, I didn't notice that.

"Q. Did you notice any instance of that? A. No.

"Q. Would those price lists have marks upon them identifying them as the list of any particular concern? A. The first page usually had their ad.

"Q. The inside pages were identical? A. The second, third and fourth pages were always the same.

"Q. Were those prices listed differently for different companies, or was it just one standard price for all companies? A. One standard price; one standard list, with these exceptions I spoke of, which weren't many.

"Q. When did that uniform price list first go into operation? A. Oh, they had one when I went there first.

"Q. How long did that continue? A. Well, they would get those out at intervals, depending wholly on the wholesale market prices of course. Sometimes they would run sixty days, sometimes ninety days; sometimes they wouldn't get them out for six months."

These lists would stand for different periods. Some for sixty days, some for ninety days and others for six months. The practice continued all the time Mr. Kessler was secretary of the old association, which covered a period from its organization until 1913, when he retired from his position as secretary. All the members put out similar price lists, with possibly slight variations, always above the list. The old association was unable to hold its members to the price lists and therein the organization failed. As Mr. Kessler said, it was not compulsory to sell at the prices stated in the lists. "There was no fine for cutting." It also appears from the testimony of Mr. Kessler that bids-of the members of the old association were reported to the association and for a time complete sales also. The old association failed to accomplish the ends desired by the members and gradually lost its influence. It died of "dry rot."

The conditions leading up to the organization of the Exchange are frankly testified to by John J. Moran of the unincorporated company of Reis-Moran Lumber Company. That company was a member of the Exchange at the time the information was filed, but not made a party respondent. He said:

"Q. Are you familiar with the conditions that existed in the retail lumber market in St. Louis prior to March, 1917? A. Yes, sir; thoroughly familiar.

State ex rel. Barrett v. Boeckeler Lumber Co.

"Q. Thoroughly familiar? What are those conditions? A. Well, they were a condition of dissatisfaction to those that had their money invested in the lumber business as a rule, especially in the retail business having departments that boasted—or of having a business that boasted of a retail department.

"Q. Now, in what way were they unsatisfactory? A. I presume the part that reached a man's heart was the part that reached his pocketbook. The competition, probably due to the number of yards, or otherwise, was very severe, and it resulted in a great deal of dissatisfaction. The tone of the business was degraded. Hardly a man in it that was proud of it. There was a condition of fellowship that was underlined with a mistrust.

"Q. Was, in your opinion, that competition honest or dishonest? A. Well, it might be classed as dishonest, but it was a condition that was forced upon the men.

"Q. By whom? A. Well, it was a condition that was probably created by—I might cite back a little—following the World's Fair there was a profitable period in the lumber business; during that time and previous to that time there was an inflow of new yards. After the Fair there was a period of depression and so on, and the number of yards probably wasn't commensurate with the demand in town; probably—I might say probably—may have had more yards than were necessary; anyway, there was a great effort to take business one firm from another, and the matter of prices always being at the head of the game, price was used to get business, to take business one yard from another, two or more men claiming the customer, and such methods as that, such features as that, bringing eventually the results that caused the prices to be continually cut, and cut, and cut—slashed—until the ultimate margin was not what it should be, making of course, or causing of course, an effort to cut out something for the money that was being paid, or that was paid, for the stuff, which was so small that compared with the cost of the stuff there was very little left to the yard."

In discussing the abuses leading up to the organization of the Exchange and the reasons for abandoning the old association, President Boeckeler said:

"Q. You say the primary purpose of the formation of this Exchange was to try to get rid of those evils? A. Yes, sir.

"Q. Had you been trying before by this other organization? A. We had.

"Q. By a previous organization? A. Yes, sir.

"Q. Had they worked out successfully? A. No, sir; it never worked at all.

"Q. Why not—in your judgment? A. We had no control of the members. We had no way to—we had no organization such as this, whereby we could educate them in the proper manner."

Doubtless the real reason for the failure of the old association was that it had no machinery to control the members or to penalize them for violation of rules. Mr. Boeckeler did not give the want of power to penalize as a reason, but it is clearly apparent that such was the real reason he had in mind. His statement that the want of an organization *to educate* the members was the cause of the disintegration of the old organization seems utterly lame, inadequate and an afterthought. We think the learned Attorney-General not unfairly sums up the situation when he says in his brief:

"While these witnesses and these exhibits, with considerable circumlocution, clearly show that the 'evil' which the Exchange was formed to eradicate was competition, called, it is true, by various damning names, as 'unfair' competition, 'cut-throat' competition, 'dishonest' competition, the respondents generally succeeded in omitting the word competition from their testimony. The constant burden of their song was that the Exchange for whose maintenance since its institution they have expended to exceed $350,000, was established for the purpose of improving the ethics of the trade and especially for the purpose of protecting the unfortunate public from their own criminal tendencies, when unrestrained. The

evils, they said, were short measurements, substitution of grades and species, not low prices resulting from competition. To give color to this explanation the respondents thought it necessary to blacken their own business reputations and to confess (each for his associates) that they were little better before they organized in 1917 than a gang of pillaging highwaymen. It is almost inconceivable, but it is true, that these men, who no doubt would be greatly shocked if any one should suggest that this admission of former depravity affects their credibility as witnesses, were willing to and did admit, in order to provide a motive for what they are doing and have done, that they were utterly unscrupulous until March 22, 1917, when their sins were organized away.''

President Boeckeler testified that respondents Boeckeler Lumber Company, Ganahl Lumber Company, Philip Gruner & Brothers Lumber Company, Holekamp Lumber Company, Mound City Lumber Company, Prendergast Lumber Company, H. E. Rapp Lumber Company, Julius Seidel Lumber Company, St. Louis Lumber Company and Vandeventer Lumber Company had been members of the old association. These companies afterwards became members of the Exchange. Their combined capital stock was about double the combined capital stock of those corporate members of the Exchange who had not been members of the old association. Thus it is apparent that the Exchange was largely comprised of former members of the old association. The old association admittedly tried to, and for a time did, fix the retail price of lumber. While not nominally taking over the old association, the Exchange largely inherited its membership, and surely its passion for fixing prices. What the old association failed to do by reason of inherent weakness in the organization itself, the Exchange could and apparently did accomplish through a superior plan and with power to control its members and penalize infractions of rules by them. The stated corporate powers of the Exchange include all the activities of the old association and many additional activities with the

powers to make such activities effective and of value to its members.

### PRICE FIXING AND LESSENING OF COMPETITION.

We think it reasonably apparent that the Exchange inherited the inclination of the old association to fix prices and eliminate competition or, at least, greatly curtail it, and we have heretofore shown from the terms of its charter and by-laws that it had the opportunity, and we think the purpose, to do this. Did the Exchange actually fix prices and eliminate competition? With the inclination and opportunity to do so fairly deducible from the evidence, it does not require a great volume of evidence to satisfy the court that this was in fact done by respondent retail lumber dealers through the Exchange. Disclaimers of such intentions and accomplishment of the desired result, by interested witnesses, even though such witnesses outnumber those testifying to the contrary, should be weighed in the light of such interest. In fact, it seems to be practically admitted by respondents that their organization did have a tendency to fix prices and to curtail competition and did so to a certain extent, but not unreasonably so. Of this later on.

Relator contends that the retail lumber trade of respondent dealers constituted ninety per cent to ninety-five per cent of the total retail lumber business within the field covered by the Exchange. Adolph W. Ganahl, president of the Fred Heim Lumber Company and former member of the Exchange, testified that the members of the Exchange did ninety per cent of such retail business. E. R. Darlington, former president of E. R. Darlington Lumber Company, put it at ninety-five per cent. Respondents say, however, that these witnesses are prejudiced and unfair.

R. S. Hoxie, manager of the Exchange at the time the testimony was taken, estimated the business of respondent dealers at fifty per cent of the total, but admitted having testified before the special commissioner, Judge SHACKLEFORD, at the preliminary investigation, that such percentage was from fifty per cent to seventy-

five per cent. Mr. Hoxie testified that there were twenty-three members of the Exchange, and seventeen lumber dealers who were not members. The testimony of other witnesses indicates, without being definite, that the number of non-member dealers was much greater than that, and Mr. Hoxie himself afterward fixed the number of non-members at thirty.

John A. Reheis, president of the St. Louis Lumber Company, with a capital stock of a million dollars, which company was a member of the Exchange from its organization, fixed the proportion of the retail lumber business done by members of the Exchange at "at least sixty per cent," but said it was not possible it was ninety per cent.

President Boeckeler said the Exchange did "far less than fifty per cent." In this connection it may be noted that he testified that his company did approximately one-tenth of the retail lumber business of St. Louis. For the year ending June 30, 1921, as shown by relator's Exhibit 27, the Boeckeler Lumber Company sold at retail 11,102,390 feet of lumber. The names of the members are not stated on this exhibit. Some sort of "key" was apparently necessary to understand the exhibit; but it otherwise appears that the Boeckeler Lumber Company made the largest retail sales, and we thus arrive at the sales of Mr. Boeckeler's company. On the basis stated by Mr. Boeckeler, the total St. Louis sales at retail for that period would have amounted to ten times that amount, or 111,023,900 feet. Mr. Gruner's figures were much greater than this. Reported sales made by members of the Exchange, with some two or three members omitted, for the years 1917 to 1921, inclusive, averaged over eighty million feet annually. This would be over seventy-two per cent of 111,000,000 feet.

The relator contends the total average annual sales of all the members amounted to at least ninety million feet. If so, the members of the Exchange controlled over eighty-five per cent of the retail lumber business of St. Louis and vicinity. The various estimates ran from fifty per cent to ninety-five per cent.

We will not undertake to find as a fact just what proportion of the retail lumber business was actually controlled by respondents. Their influence on the business was doubtless greater than the proportion of their business to that of the total number of retail lumber dealers in St. Louis, both those who did and who did not belong to the Exchange. The Exchange members were organized. Their influence was thus combined and more powerful. The non-members worked alone. They had no organization to further their interests. The full extent of the trade strength of respondents is further apparent when it appears that their retail business was approximately one-third of their total business. The conclusion necessarily follows that the Exchange, through its members, exercised a dominating influence upon and control over the St. Louis retail lumber market, whether they did fifty per cent or seventy-five per cent of the St. Louis retail lumber business.

Did the organization of the Exchange and adherence to its rules, either voluntarily or under compulsion, by reason of penalties, eliminate, or tend to eliminate, competition and did such organization fix prices or tend to fix prices? Prior to the time the Exchange came into existence, the individual dealers, who afterwards became its members, were at liberty to make such terms of sale as they pleased. The Exchange required them to make terms of sale at thirty days net, with two per cent discount for cash upon payment on or before the tenth day of the month following delivery. For a breach of this rule a member might be punished. President Boeckeler testified that prior to the organization of the Exchange the dealer could make any discount or give any credit he wished. The Exchange forbade such complete liberty of action. Credits and discounts are clearly important elements in competition. By its rules and strict enforcement thereof, the Exchange largely destroyed this element of free competition.

The rules forbade advancement of money to contractors. It is quite likely competent contractors, natur-

ally customers of a given dealer or attached to such dealer by his ability to render financial assistance, would be unable to bid upon certain contracts and the business would be lost to such dealer. The dealer was not allowed, except under specified circumstances, to take mortgages on account or surrender material men's liens upon structures. The manner of deliveries was also regulated and made uniform. These restrictions undoubtedly greatly lessened competition. The elimination of such means of getting business, not in themselves reprehensible in any way, but strong points in attracting a certain class of customers, clearly eliminated a portion of the competition. The rules against such practices not only had a tendency to curtail competition, but actually did it.

But the strongest feature of the organization was the price-fixing feature. The service charge and the replacement cost were the means used. Under the advice of L. C. Boyle, a former Attorney-General of the State of Kansas, a plan was devised which was thought not to violate the statutes of this State against agreements, combinations and understandings in restraint of trade. General Boyle advised the dealers that the plan was safe, although he admitted it had never passed muster in the courts. The plan ostensibly was to have a scientific study made of the cost to the retail dealer of handling lumber from the manufacturer to the consumer and make it obligatory upon members of the Exchange to add such cost of doing business or service charge, when thus ascertained, to replacement cost, leaving it to the dealer to secure a profit out of the selling cost over and above the sum of the service charge and replacement cost.

The replacement cost was ostensibly the wholesale price of lumber to replace stock, before the dealer had been put to any expense in handling, storing, insuring, selling, delivering, billing, collecting for same, etc. The standing committee on market conditions was entrusted with the duty of studying and analyzing market conditions and keeping the members informed concerning

wholesale prices. At first the committee compiled and furnished to the members from time to time lists of such wholesale prices. President Boeckeler testified:

"A. Oh no, I see what this is: This is a list that was compiled by a committee on the market conditions.

"Q. A committee of the Exchange? A. Yes, sir.

"Q. Compiled for the Exchange? A. Yes, sir.

"Q. For the use of the members? A. Yes, sir, as a guide and as to the market of the possible purchase price of certain commodities.

"Q. How often was a list of that kind prepared by the Exchange? A. That varied.

"Q. Periodically, lists of this kind were sent out? A. Yes, sir; if there was any great change in the market, the market commitee got together and brought their various quotations from the wholesalers, and finally determined, as to their best ability, how to arrive at a fair and equitable market.

"Q. And that practice still continues? A. No, sir.

"Q. When was it discontinued? A. Two years ago or more.

"Q. Why was it discontinued? A. Because we found, in following the quotations as published in the publication of 'Lumber,' that they accurately reflected the market, and as a good many of our yards have kept a very intelligent record on the subject it was concluded to adopt 'Lumber' as a basis, and since that time the Exchange, as well as other members, have kept in touch with the publication of 'Lumber' and the market conditions and find that the publication of 'Lumber' does reflect the true market.

By JUDGE GOODE: The true wholesale market? A. Yes, sir; and it was far simpler and easier than this form of sending out information to its members.

"GENERAL OTIS: You began then to use 'Lumber' as the source of information of the Exchange and its members, about two years ago? A. I think it was two years ago.

"Q. Do you remember the exact date? A. No, sir.

"Q. Could you approximate the exact date? A. I couldn't do that, it is in the records.

"Q. In what records would that be? A. The secretary can give you the date.

"Q. Prior to the time when you began using 'Lumber' as the source of information of the Exchange of wholesale prices, the Lumber Exchange Committee arrived at that same information, or tried to, and incorporated it in bulletins of which Relator's Exhibit No. 2 is an example? A. Yes, sir.

"Q. Of course, the questions I have just asked you, that I have referred to 'Lumber,' I have been referring to the publication called 'Lumber' and I infer you have been? A. Yes, sir.

"Q. This sheet, as I understand you now, was what was used until two years ago as the basing price by the members of the Exchange; that is correct, isn't it? A. Yes, sir.

"Q. How did the committee of the Exchange arrive at these figures—these wholesale prices? A. The committee was composed of five members, I believe, and they were all experienced and well-informed lumbermen, who got their data from the manufacturers and wholesalers throughout the South—brought them together, met at this meeting, and all produced their quotations, and in that way did the best they could to arrive at an equitable and fair basis as a wholesale market of lumber."

It appears that the wholesale prices determined by the market conditions committee ran along so closely with those quoted in the trade publication called "Lumber," a publication not controlled by the Exchange, that it was found the quotations of "Lumber" could safely be accepted, and the market conditions committee practically ceased to function so far as furnishing the members with the results of their independent investigations was concerned. All that committee did thereafter was to advise the members of fluctuations in the wholesale market as shown by "Lumber."

That the wholesale prices fixed by the market conditions committee at first and later by ''Lumber'' were used as a basis by the dealer members and required so to be used by them is shown also by President Boeckeler's testimony:

''Q. When a member of the Exchange makes a price or submits a bid to a customer, there are three elements taken into consideration. First, the wholesale market price; second, what is called the service charge, and, third, his profit—is that correct? A. Yes, sir.

''Q. Two of those elements, namely, the wholesale market price and the service charge, are determined for the members by the Exchange, is that correct? A. No, sir.

''Q. The service charge is determined for the member, by the Exchange? A. Yes, sir.

''Q. You mean then, that the wholesale market price is not determined for the members, by the Exchange? A. No, sir.

''Q. However, the wholesale market price is supplied to the member by the Exchange? A. Simply as a matter of information, which is public knowledge.

''Q. It is supplied, whether as a matter of information or not, it is supplied to the members? A. Yes, sir.

''Q. That is done weekly, is it not? A. Whenever the market changes, which is about weekly.

''Q. As I understand it, if I am mistaken you will correct me. Of course, those wholesale market prices that are supplied by the Exchange to the members are obtained by the Exchange from the publication called 'Lumber?' A. It is also obtained by each and every member from the same publication.

''Q. I understand, but the Exchange obtains its information from that publication? A. Yes, sir.

''Q. And it sends that information out to the members in printed or typewritten forms, mimeographed forms? A. It simply notes the changes; in other words, the Exchange in one operation will do what every one of

the members would have to do individually, and as a labor-saving device they notify the members of any change in the market, as shown by the publication of 'Lumber'.

"Q. In what form are they notified, by printed sheet, typewritten or mimeographed? A. That is mailed to the members.

"Q. That is one of the functions of the Exchange to furnish the information to the members? A. Yes, sir.

"Q. And the member of the Exchange is required to use that as a basis in fixing his selling price, is that correct?

"By JUDGE GOODE: We object to the form in which he tells him it is used.

"By THE COMMISSIONER: Ordinarily that would not be permissible, but this is a witness on one side who is interested.

"By GENERAL OTIS: I will be very glad to change the form of the question.

"By THE COMMISSIONER: It might be well to do that hereafter.

"By GENERAL OTIS: Although I think the rule is unquestionable that we have a right to cross-examine this witness, he is an interested party.

"By THE COMMISSIONER: All right.

"GENERAL OTIS: I will ask you whether or not members of the Exchange are not required by the Exchange to observe, in fixing their retail price, the wholesale market price furnished them by the Exchange as the basis on which that retail price is built up? A. That is—there is no requisition set forth in the by-laws of the Exchange, and this is simply as information to the members as to what the market is.

"Q. Are the members not required to take that as the basic price, and do they not take it as that? A. Yes, sir.

"Q. They are expected to take that? A. Yes, sir."

Thus it appears that the Exchange definitely fixed two elements of the selling price. It did not announce a

definite figure for the wholesale price, but the committee on market conditions, and later "Lumber," announced proper wholesale prices, and the members were expected to and in fact were required to observe the same and to add to that the service charge. These elements were fixed and certain because they could be and were thus made fixed and certain.

In this connection the testimony of Adolph W. Ganahl was as follows:

"Q. Do I understand you to say that, when you have added a service charge to the cost prices furnished you by the Exchange, the result was your selling price? A. Yes, sir.

"Q. That is your retail selling price to your customers? A. Yes, sir.

"JUDGE GOODE: You must have added a profit.

"GENERAL OTIS: As a matter of fact, did you add any profit, or was that your retail selling price? A. This was our retail selling price, only in several instances I did add a profit.

"Q. But in the general run of instances was that table that you prepared, which is Relator's Exhibit 8, was that your retail selling prices? A. That was the retail selling price; yes, sir.

"Q. Where did you get your profit—out of the service charge? A. I didn't state there was any profit on that. That was supposed to be a handling charge.

"Q. I say in those cases where did you get any profit, if you got any profit, when you used those prices as the retail selling prices? I mean when I say 'those prices' the prices contained in the table of prices appearing on Relator's Exhibit 8? A. Well, the Exchange explained it—

"Q. I am not asking you what the Exchange explained. I am asking you where you got your profit, if you got any, when you sold at the prices contained on that sheet? A. Supposed to have been included then in the service charge.

Vol. 301          OCTOBER TERM, 1923.          513

State ex rel. Barrett v. Boeckeler Lumber Co.

"Q. Yes, sir. What did you find resultant, if anything, when you added any profit to the prices that are contained on the sheet of paper marked Relator's Exhibit 8? When you bid in competition with other members of the Exchange what was the result with the comparison of your prices and theirs? A. We were generally slightly higher.

"Q. In those cases when you did add a profit and thereupon found you were higher than the members of the Exchange who bid in competition with you, what amount of profit did you add, if you remember? A. From twenty-five cents to a dollar a thousand.

"Q. And when you added that you found you were higher than the other members of the Exchange? A. Yes, sir.

"Q. And, of course, in that event you lost the job; is that right? A. Yes, sir."

Respondents assert that competition was left free and open by reason of the fact that prices were fixed only as to replacement and handling costs, and because the dealer was free to fix his selling price at such additional sum as he could secure in competition with other Exchange members and non-members, under the other protective regulations of the Exchange, and thus take a profit in addition to replacement and handling costs. But in practice this result was not attained. The fact appears that the wholesale prices announced by the market conditions committee and later by "Lumber" were not necessarily the actual wholesale prices. Again we quote from President Boeckeler:

"Q. My question is this: You have stated that the members of the Exchange were expected to follow the wholesale market price and take that as the basic price. Now, my question is—the members of the Exchange, for example, your company, the Boeckeler Lumber Company, is expected to take the wholesale price as furnished by the Exchange, even though in a particular instance the Boeckeler Company had purchased lumber which it was about to sell, below the wholesale market price fur-

nished you? A. The Boeckeler Lumber Company, as I may speak in that regard, considers the quotations as .set forth in the publication of 'Lumber' as reflecting the market; any purchases we might make under that quotation would be nothing more than an advantageous purchase and would be considered under the market and we would ordinarily simply consider that part of our profit and would accept the publication of 'Lumber' as a fair reflection of the market and use that as a market in the basis of our quotations.

"Q. That is what I understood and wanted you to make clear—the market price furnished by the Exchange is taken as basing point irrespective of what they actually paid to the wholesaler? A. It is my experience you are not buying it for much less than is published; if you do, it is nothing more than taking it advantageously.

"Q. As I say, the member of the Exchange is supposed to and does take the market price furnished by the 'Exchange' as the basic price, even though the member may have purchased lumber at a less than wholesale price? A. Yes, on that basis.

"Q. That has been the practice of the Exchange since its formation, has it not? A. Yes, sir."

On rapidly advancing wholesale prices a large profit could be taken, but, on the other hand, rapidly falling wholesale prices would entail large losses on stock on hand. However, there was nothing in the rules and by-laws preventing the member from selling above the wholesale price, if he could get that price. The forbidden thing was to sell below the current wholesale price, plus the service charge.

W. W. Bradley, president of the National Lumber Company, an independent dealer, testified:

"Q. Have you compared the invoice prices which you have paid at any time with the prices quoted in the publication called 'Lumber?' A. No, sir.

"Q. Have you, or have you not, a general impression as to the comparison between those prices? A. I have a general knowledge of the prices.

"Q. What is your answer? A. General knowledge of the prices of the wholesale.

"Q. What is that general knowledge? A. We get lists from the large mills quoting prices—selling us.

"Q. How do those lists from the large mills compare with the prices in 'Lumber?' A. Well, they are generally a little higher than what we can buy it for from the smaller mills.

"Q. But the prices in this publication called 'Lumber,' how do they compare with the prices from those large mills that you speak of? A. Well, I think they are generally higher—the publication is I mean.

"Q. They are higher? A. The published list.

"Q. You think the published list is even higher than the lists that come ordinarily from the large mills? A. Yes, sir.

"Q. And you are certain at least that in a great number of instances you can buy at a lower figure than the figures from the larger mills, which are often even lower than the figures published in 'Lumber;' is that right? A. Yes, sir; at times."

Testifying in relation to the subject of how prices were fixed before the Exchange was organized, Leo Ganahl, former general manager of Fred Heim Lumber Company, for a month or more a member of the Exchange, said:

"Q. What was your gross profit, Mr. Ganahl, on jobs of that character, per thousand? A. We always figure jobs at the price we had the lumber in the yard, or at the price we could buy it at. If we had the lumber in the yard at a lower price than we could buy, we used that figure. It was always best to base our estimate upon the cost of material and then add what we thought we would be able to get the job at, and it was sometimes as low as a dollar and a half.

"Q. Per thousand feet? A. It was the price we could buy it at, or the price we had the stuff in the yard.

"GENERAL BARRETT: Are you talking of past conditions? A. The conditions during the time that I was in the lumber business."

Thus it is shown by substantial and convincing testimony that the wholesale prices, furnished first by the Exchange and later by "Lumber," were frequently, indeed usually, higher than actual wholesale prices and, by using them and adding the service charge, a profit could be secured.

The service charge or cost of doing business is not claimed to have been the actual cost incurred by any particular dealer. It was an artificial cost, an average (so it is claimed) of the cost incurred by efficient dealers doing seventy-five per cent of the business done by members of the Exchange.

In his reply brief relator shows from nine exhibits wide variations in the expenses of doing business per thousand feet, as between the least and the most efficient companies, follows:

Relator's Exhibit 11, .........$ 6.60 to $18.43
Relator's Exhibit 20, .........  6.49 to  19.41
Relator's Exhib't 21, ....$7.00 ($7.11) to $14.53
Relator's Exhibit 22, .........  8.93 to  15.36
Relator's Exhibit 23, .........  9.53 to  15.38
Relator's Exhibit 24, ......... 10.52 to  16.36
Relator's Exhibit 25, ........ 10.01 to  19.97
Relator's Exhibit 26, ........ 12.00 to  25.47
Relator's Exhibit 27, ......... 12.37 to  23.27

The expenses of the most efficient companies, of course, show smaller variations between the high and the low expenses used in making up the average constituting the service charge.

It is claimed that the service charge did not include any allowance for profit, bad debts, depreciation of stock, interest on investment in plant or Federal income taxes. Just why unpreventable losses through bad debts, deterioration of stock, and interest on investment tied up in the plant of the member were not regarded as legitimate expenses is not made clear, and the reason for their exclusion is not apparent to us. But so runs the testimony. Where the dealer paid rent, that item was considered. Federal and State income taxes are presumably

calculated on and are deductions from net income, and, of course, do not constitute operating expenses. The service charge did, however, include dues to the. Exchange.

There can be no serious contention about the fact that the retail price of lumber in St. Louis during the activities of the Exchange was such wholesale price, plus such service charge. Not only did Adolph Ganahl and E. R. Darlington, formerly members of the Exchange, and said by respondents to be prejudiced witnesses and possessors of grievances against the Exchange, so testify, but R. S. Hoxie, manager of the Exchange and presumably authorized to speak for it, admitted as much. On this point and when explaining an advertisement appearing in the St. Louis newspapers on September 16, 1921, Mr. Hoxie testified as follows:

"Q. Is it true or not true that that broken line, which you have here, saying 'St. Louis Retail Prices' correctly informs the public as to what the retail prices were?" (Referring to relator's Exhibit 16). "A. I consider it does.

"Q. That is on the theory and only on the theory that the retail prices are the service charge, plus the wholesale, and upon no other possible theory? A. No, sir.

"Q. How do you reconcile those two statements? A. There are sales made on that basis.

"Q. Did you intend to inform the people of St. Louis in this, the retail price that might occasionally be made or the general retail price? A. General.

"Q. You didn't intend to represent to them an occasional retail price, as a general retail price? A. No, sir.

"Q. You intended that this line on this chart, marked Exhibit 16, to be a truthful statement of the St. Louis retail prices from July, 1917, until the present time? A. Yes, sir.

"Q. And is it a truthful statement? A. Yes, sir.

"Q. However, this line—the broken line on this chart which you have labeled here as 'St. Louis Retail Price'—is nothing more than the wholesale price, plus the service charge? A. Yes, sir.

"Q. So you now say that the retail price in St. Louis since the organization of this Exchange, as shown by your records and as shown by this chart, is the wholesale market price, plus the service charge? A. Yes, sir.

"Q. The Exhibit 16, which you have just identified, being the advertisement that appeared in the St. Louis papers, is a copy only of Respondents' Exhibit A which was identified by you at Jefferson City on the 9th of September, is it not? A. Yes, sir.

"Q. Respondent's Exhibit A, however, contains one additional graphic line to that which appears on the exhibit that has been marked as Relator's Exhibit 16, and that additional line is the line which indicates the rise and fall of the service charge? A. Yes, sir.

"Q. On Respondents' Exhibit A that additional line that I have just spoken of is called the 'Wavy line, cost of service,' isn't it? A. Yes, sir.

"Q. That wavy line appearing on Respondents' Exhibit A is an exact statement of the service charge as taken from your records? A. Yes, sir.

"Q. And that service charge, added to the wholesale price, gives the third line, namely, what you now say is the retail price? A. Yes, sir.

"Q. That is right, is it not? A. Yes, sir."

The explanation attempted in respondents' brief that Mr. Hoxie referred only to occasional sales and not to retail prices in general is not convincing.

It is a strain upon credulity to accept the contention that neither the replacement cost nor service charge includes dealer's profit when for years the retail prices were exactly equal to the sum of such replacement cost and service charge. We can hardly be expected to believe respondents were in business for their health or as public benefactors.

On the point of uniformity of prices we quote from the testimony of R. L. Rinehart, officer of a large contracting company, operating in St. Louis, and a heavy purchaser of lumber. This is shown by the fact that his company constructed the Jefferson Hotel, the Statler Hotel, the Railway Exchange Building, the Grand Leader building and other large buildings. He said:

"Q. Mr. Rinehart, I want you to state whether or not you have noticed any difference as to the uniformity of prices charged for lumber sold in St. Louis since the spring of 1917 as compared with the condition before that time? A. Yes, I have.

"Q. Will you state what you have noticed in that regard as a contractor? A. Well, during the years of 1918 and 1920 there was, on retail prices, a uniformity of price on all quotations we received.

"Q. Do you purchase lumber from certain lumber companies or from all the lumber companies in St. Louis? A. Well, we purchase from those we are acquainted with.

"Q. What are the principal companies with which you have been doing business in the last three or four years? A. Well, the Ganahl Lumber Company; the Gruner Lumber Company; Shellabarger Lumber Company; Hill-Behan.

"Q. To what extent has that uniformity of prices that you speak of existed? I mean about what degree of variation, if any, has there been in the prices that have been made by these companies? A. There isn't any at all.

"Q. Was there a considerable variation, or any variation, in prices prior to 1917? A. Some, yes."

Respondents deny uniformity of prices under the Exchange and cite the facts that there was considerable variation, sometimes as much as twenty-five per cent, between the various bids made on business offered by the city of St. Louis. The testimony of the deputy in the Supply Commissioner's office tends to support this contention. Just why such variation in bids was shown only as to purchases by the city does not appear.

That the bids for city business did not always vary to any material extent is shown by certain bids shown to one of respondents' witnesses. On September 14, 1917, on streets and sewers, Requisition 61, on lumber to be delivered Quincy Street, the following bids were made:

Boeckeler Lumber Company .........$661.00
St. Louis Lumber Company .......... 661.19
. Prendergast Lumber Company ........ 661.20
Ganahl Lumber Company ............ 661.29
Julius Seidel Lumber Company ........ 661.29
Darlington Lumber Company .......... 661.30
Gruner & Brothers Lumber Company .. 661.30

Again on June 27, 1919, on streets and sewers, Requisition 169, various prices of No. 1 yellow pine lumber, the bids were as follows:

Boeckeler Lumber Company ..........$695.22
. Wiles-Chipman Lumber Company ...... 695.22
Gruner & Brothers Lumber Company .. 695.22
Julius Seidel Lumber Company ...... 695.22

The uniformity of prices fixed by the respondents submitting bids, as shown above, is remarkable, unless it can be explained by the fact that the selling price was fixed by agreement in those instances. It is only just to say that we have not found where the foregoing bids on city business were directly offered in evidence.

It is admitted that up to January 1, 1920, penalties were imposed upon members for cutting prices below the sum of such wholesale prices and the service charge as thus fixed. It is contended that after that date no penalties were imposed for such offenses. Testifying to this point, President Boeckeler said:

"Q. Now, upon this wholesale basing price furnished by the Exchange, I mean the information furnished by the Exchange to the members, the members of the Exchange are required—to that they are required to add the service charge. That is true, isn't it? A. The members are simply told that the service charge shall prevail.

"Q. That is the rule of the Exchange, that the service charge shall prevail? A. Yes, sir.

"Q. That means that a member who doesn't add that fixed service charge to his selling price violates the rules of the Exchange, doesn't it? A. Yes, sir.

"Q. And that he is subject to being penalized and fined for violating that? A. No, sir; not since 1920.

"Q. You discontinued that? A. Yes, sir; in January, 1920.

"Q. Upon the advice of counsel? A. Yes, sir.

"Q. That it was a violation of the anti-trust laws? A. I don't know that it was definitely stated what views our counsel took in the matter.

"Q. You know that, Mr. Boeckeler, don't you? A. I would say so; yes, sir.

"Q. Do you know what the exact date was when you discontinued penalizing members for not conforming to the service charge rule? A. My best recollection is January 1, 1920.

"Q. Nevertheless, while you no longer impose a fine for a violation of that rule, nevertheless, the rule still exists that the members shall charge the same service charges? A. Oh, yes.

"Q. Prior to the first of January, 1920, or prior to the date, on advice of counsel, you discontinued fining members for violation of the service charge rules— that was one of the chief activities of the Exchange? A. It was one of the activities.

"Q. It was the chief activity, at least of the board of arbitration? A. It was one of their activities, whether it was the chief one, possibly so.

"Q. There was scarcely a meeting of the board of directors when there was not one or more complaints, when some member or more than one member had violated the rules. Isn't that correct? A. Yes, sir.

"Q. And the board of directors referred it to the board of arbitration? A. Yes, sir.

"Q. Your company was frequently fined for violation of the service charge rules? A. Yes, sir.

"Q. And frequently fined for violations? A. Yes, sir; we have been.

"Q. And what was true of your company was also true of each of the respondent companies? A. Yes, sir."

That the imposition of penalties for cutting prices was a stern realty is shown by the minutes of the board of arbitration of the Exchange. The entire record is set out in the transcript and required 184 pages of printed matter to reproduce it. It set forth the records of 679 cases. The learned Attorney-General at page 84 of his brief makes a summary of these complaints, which is unchallenged by respondents, except to intimate that some of the cases called price-cutting complaints may have really been complaints for the violation of other rules. We set out the summary:

"Total number of cases .................. 679
"Charges of cutting Exchange prices .... 649
"Fines remitted on account of outside com-
        petition .......................... 355."

The Attorney-General makes the further analysis of the minute book, as follows:

"Study of the minute book of the board of arbitration in connection with other evidence reveals the illuminating fact that while the Exchange prohibited price-cutting as between the members, it licensed and approved price-cutting as against all companies which were not members. In hundreds of instances in that record it will be observed that members were fined for price-cutting and the fine remitted on the ground that there had been 'unfair competition.' "

To support his analysis he quotes from the testimony of G. L. Walters, secretary of the board of arbitration, and we reproduce such testimony directly from the transcript:

"Q. Certainly, but I want to get clear just what—whenever the term 'unfair competition' is used in this book it refers to competition by an outside company, doesn't it? A. Yes, usually by outside competition.

"Mr. Carter: I submit, Your Honor, he is misleading the witness. He has repeated twice it was the competition of an outside member that was unfair and below cost, and not merely an outside member.

"The Commissioner: You seem to be leading him back. Go ahead.

"General Otis: Now, I want to ask you again, and I am not misleading you; you listen to what I say and you won't be misled; where the word 'unfair' is used in this book—I am now referring to the minute book of the board of arbitration, Relator's Exhibit 32—when it appears that by reason of 'unfair competition,' as it says, the fine is remitted, that refers to a case in which there has been competition by an outside company, doesn't it? A. Yes.

"Q. Yes, sir. Now, you understood that question all right, didn't you? A. Yes.

"Q. When did you discontinue assessing fines for violation of the service charge rule, if you ever did discontinue that practice? A. Well, I don't believe we fined any this year for violation of the service charge.

"Q. You mean 1921? A. Yes."

Thus it appears that over ninety-five per cent of the cases before the board of arbitration were at least nominally for price-cutting and less than five per cent for substitution of grades, short measurements, etc. The minutes of the board of arbitration speak louder than disclaimers to the contrary that price control was the principal object of the Exchange.

### INJURY TO THE PUBLIC.

Relator contends that the effect of the activities of the Exchange has been to increase greatly the cost of lumber and to mulct consumers of millions of dollars. We are satisfied prices were increased directly to a certain extent thereby, with resulting injury to the public, but it does not appear that the Exchange was responsible for anything like the full extent of the increased prices which prevailed almost immediately after it was organized and began to function. The great mass of the

testimony so shows. Large increases did come, but it does not appear that the Exchange was responsible for the greater part of such increase. However, we are com-compelled to disagree with respondents' contention that the public was not injured.

Increased prices were evident, not only in lumber, but in all other commodities. This was clearly shown by the testimony of Paul W. Brown and others. The entire existence of the Exchange has been within the period covered, first, by our entrance into and participation in the great World War, which utterly upset prevailing prices and repeatedly sent them up by unprecedented advances, and, second, by abnormal conditions since the war. A new and tremendous demand for lumber for ships, cantonments and buildings to house war industries was coincident with a great labor shortage, due to withdrawal from ordinary industry of millions of men for military training and overseas duty and increased demand for labor in new industries serving preparation for war.

It would manifestly be unfair to attribute the rise in prices immediately following the incorporation of the Exchange entirely to or even largely to its activities. Some of the increase, however, may thus be accounted for. The increased costs of labor, supplies, etc., naturally were reflected in the cost to the dealer of doing business and largely accounted for the increased amount determined as the service charge. The same considerations, together with increased freight rates, said to be seventy-one per cent, were also reflected in the wholesale prices with which respondents were confronted. The evidence does not show that consumers of lumber have lost millions of dollars because of the activities of the Exchange, as claimed by relator. They, no doubt, have been compelled to pay higher prices on that account. Such is the tendency to be expected from the scheme comprised in the Exchange and there is substantial testimony to that effect. Even though no showing of actual injury to the public has been made, "the obvious and

necessary effect of the agreement is to restrain trade" and that is a sufficient showing. [State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, 1. c. 314.]

On the other hand, the evidence shows that respondents' contention that many of the abuses of the retail lumber business prevalent before the organization, if they then existed to the extent claimed by respondents, have been largely eliminated. True, many practices, inherent in unrestricted competition and not reprehensible in themselves, have gone with the bad practices. Respondents contend that the main purpose of the formation of the Exchange and of its rules was to eliminate dishonest practices from the retail lumber business in St. Louis and to inculcate more economical methods of business and that whatever restraint upon trade has resulted is only incidental and is not unreasonable restraint.

A great many pages of the transcript are filled with testimony concerning dishonest and intolerable practices which had grown up among the retail lumber dealers. Few specific instances were cited. Some of these were repudiated afterwards. The eradication of such dishonest practices and trade abuses was worthy of the combined efforts of the lumber dealers. However, one cannot read this record without arriving at an abiding conviction that price raising and fixing and restriction of competition—not only dishonest, cut-throat, ruinous competition, but just plain, old-fashioned competition— were the main purpose and object of calling the Exchange into being and that the elimination of dishonest practices was the incidental part of the scheme. Such alleged worthy purpose was merely the cloak in which the real purpose was dressed to make it look respectable. Such view of the facts makes it unnecessary to consider cases relied on by respondents as holding agreements, pools, etc., to be legal where the main purpose is lawful and restraint of trade is only incidental.

The case of State ex inf. v. Standard Oil Co., 218 Mo. 1, cited and relied upon by respondents, announced no rule of law which can avail respondents under the

facts in this case. In speaking of the same statutes we are here considering, WOODSON, J., said at page 379:

"They prohibit the making of all contracts and combinations which have for their object and purpose the restraint of trade or the fixing and maintaining of prices; but those sections in no manner denounce as illegal any contract regarding trade which has for its object a legitimate purpose and which only incidentally stifles trade."

### OPEN COMPETITION PLAN.

The plan of the Exchange on paper was not exactly the "Open-Price Plan" or the "Open-Competition Plan." Bids and sales were required to be reported to the Exchange, but the evidence shows that only competitors and the proper officials had access to such bids and sales ordinarily.

Respondents cite the case of United States v. American Linseed Co., 275 Fed. 939, as supporting the legality of the "Open-Price Plan." We quote from the opinion of CARPENTER, District Judge, as follows:

"The purpose of the council and bureau was to collect and furnish to the various members current quotations on linseed oil, the record of sales of oil, including prices, statistics as to stocks on hand, crop conditions at home and abroad, and other information of interest or value to the manufacturers of linseed oil. The Armstrong Bureau entered into contracts with certain of the defendants and agreed to furnish them the foregoing information for a consideration.

"Pursuant to these contracts, the various subscribers daily reported their price lists to the bureau, and promptly sent word of any change. Other information was also furnished from time to time. The statements received and collected by the bureau were immediately sent out to all the members of the association.

"The record discloses that the information collected and distributed by the bureau to its several members was of the kind which a sagacious business man secures, or endeavors to secure, in the operation of his enterprise. The information was true. The price lists furnished

were made in the regular course of business, and offered in good faith to customers or prospective customers. *There was no proof that the members of the association ever, at the bureau meetings or at any other place, discussed prices or made agreements with respect to prices,* and there was no evidence that the prices asked by any of the subscribers were not in accordance with the market price of flax seed, upon which the price of linseed oil was based.

"Production was not limited during the period the bureau was in operation. There was no proof of division of territory. There was no proof that the prices asked by the individual defendants were not fixed by them upon their own judgment, considering all factors affecting supply and demand. *There was no proof showing that any member was under the slightest obligation or constraint to ask higher prices or maintain prices."* (Italics ours).

It may be seen at a glance that the plan of the Armstrong Bureau, of which the American Linseed Oil Company was a member, was not in the same class with the Exchange we are considering. As Judge CARPENTER there said: "The only restraint which the rules of the bureau on their face impose is that the members agree not to deviate from their price lists without informing the other members at once by telegraph. At the close of each business day every member knew until the next day what the market was." That scheme was very different from this one which *bound* the members of the Exchange to charge not less than certain prices and provided for penalties for violation of the rules. The facts in the American Linseed Oil Company Case did not go far enough and the opinion of Judge CARPENTER based thereon affords no support for respondents in contending for the legality of the agreements they made through the Exchange, where there is *present* the very thing the *absence of which* in the American Linseed Oil Case is so much stressed by Judge CARPENTER, to-wit, control over prices. Nor did the plan of the Armstrong Bureau *on paper* contemplate an agreement on prices, not even minimum prices.

The very late case of American Column & Lumber Co. v. United States, 42 Sup. Ct. Rep. 114, written by Mr. Justice CLARKE and concurred in by Chief Justice TAFT and four other justices, six in all, dealt with the so-called ''Open-Competition Plan'' among the hardwood lumber dealers. The district court of the Western District of Tennessee had granted a permanent injunction against plaintiffs in error as members of the American Hardwood Manufacturers' Association, and the Supreme Court affirmed the judgment. The plan of that association on paper contemplated daily and other reports covering sales actually made with full details and shipments thereunder, monthly reports on production during the preceding month and stock on hand; monthly reports showing price lists and immediate reports on new prices. The plan also contemplated inspection by the association. It was provided:

''All of these reports by members are subject to complete audit by representatives of the association. Any member who fails to report *shall not receive the reports* of the secretary, and failure to report for twelve days in six months shall cause the member failing to be dropped from membership.''

Mr. Justice CLARKE said: ''Plainly it would be very difficult to devise a more minute disclosure of everything connected with one's business than is here provided for by this Plan, and very certainly only the most attractive prospect could induce any man to make it to his rivals and competitors.''

The scheme contemplated the reciprocal arrangement of full reports of the secretary of the association to all members.

The opinion then proceeded:

''This extensive interchange of reports, supplemented as it was by monthly meetings at which an opportunity was afforded for discussion 'of all subjects of interest to the members,' very certainly constituted an organization through which agreements, actual or implied, could readily be arrived at and maintained, if the members desired to make them. . . .

"This elaborate plan for the interchange of reports does not simply supply to each member the amount of stock held, the sales made and the prices received, by every other member of the group, thereby furnishing the data for judging the market, on the basis of supply and demand and current prices. It goes much further. It not only furnishes such information, with respect to stock, sales and prices, but also reports, giving the views of each member as to 'market conditions for the next few months'; what the production of each will be for the next 'two months'; frequent analyses of the reports by an expert, with, we shall see, significant suggestions as to both future prices and production; and opportunities for future meetings for the interchange of views, which the record shows were very important. It is plain that the only element lacking in this scheme to make it a familiar type of the competition-suppressing organization is a definite agreement as to production and prices. But this is supplied: By the disposition of men 'to follow their most intelligent competitors,' especially when powerful; by the inherent disposition to make all the money possible, joined with the steady cultivation of the value of 'harmony' of action; and by the system of reports, which makes the discovery of price reductions inevitable and immediate. The sanctions of the plan obviously are financial interest, intimate personal contact, and business honor, all operating under the restraint of exposure of what would be deemed bad faith and of trade punishment by powerful rivals."

The way in which the Hardwood Manufacturers' Association offended was in *urging* increases of prices and in curtailing production. No compulsion was employed other than discontinuance of reports and fear of displeasure of the association. There was no *agreement* to raise or maintain or fix prices or to curtail production and, of course, no fines or forfeitures were imposed. In this respect the case before us is different. The facts here make a much stronger case against respondents.

The words of Mr. Justice CLARKE apply very appropriately to the Exchange:

"Such close co-operation, between many persons, firms, and corporations controlling a large volume of interstate commerce, as is provided for in this Plan, is plainly in theory, as it proved to be in fact, inconsistent with that free and unrestricted trade which the statute contemplates shall be maintained, and that the persons conducting the association fully realized this is apparent from their protesting so often as they did, in many of their confidential communications appearing in this record, that their purposes were not unlawful, that they sought only to supplant cut-throat competition with what in their own judgment would be 'fair and reasonable competition,' and to obtain, not make, fair prices, and by their repeated insistence that the Sherman Law, 'designed to prevent the restraint of trade, is itself one of the greatest restrainers of trade, and should be repealed.'

"To call the activities of the defendants, as they are proved in this record, an 'Open-Competition Plan' of actoin is plainly a misleading misnomer.

"Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals, as the defendants did; they do not contract, as was done here, to submit their books to the discretionary audit, and their stocks to the discretionary inspection, of their rivals, for the purpose of successfully competing with them; and they do not submit the details of their business to the analysis of an expert, jointly employed, and obtain from him a 'harmonized' estimate of the market as it is, and as, in his specially and confidentially informed judgment, it promises to be. This is not the conduct of competitors, but is so clearly that of men united in an agreement, express or implied, to act together and pursue a common purpose under a common guide that, if it did not stand confessed a combination to restrict production and increase prices in interstate commerce, and as, therefore, a direct restraint

State ex rel. Barrett v. Boeckeler Lumber Co.

upon that commerce, as we have seen that it is, that con-conclusion must inevitably have been inferred from the facts which were proved. To pronounce such abnormal conduct on the part of 365 natural competitors, controlling one-third of the trade of the country in an article of prime necessity, a 'new form of competition,' and not an old form of combination in restraint of trade, as it so plainly is, would be for this court to confess itself blinded by words and forms to realities which men in general very plainly see, and understand and condemn, as an old evil in a new dress and with a new name.''

### REASONABLE RESTRAINT OF TRADE.

Respondents apparently confess that the activities of the Exchange did restrain trade and curtail competition to a certain extent, but not unreasonably so, and that our statute should be construed to permit combinations and agreements whose main purposes are lawful and which do not unreasonably restrain trade; that prices have not been raised to the injury of the public; that the activities of the Exchange on the whole have been of great benefit to the public; that for such reasons— and the record contains quite substantial testimony to support such contentions—this court should not condemn the activities of the Exchange or visit punishment upon respondents for their participation in the plan.

The conclusion is irresistible that respondents have not only become members of a pool, agreement, combination, confederation and understanding for the purpose of regulating, controlling and fixing the price of lumber at retail and limiting and restricting competition, and that such was the chief purpose of such organization, but that they have actually accomplished such purpose. Are such acts unlawful because such restraint of trade is reasonable, as respondents contend it has been? Division One of this court has given its answer to this question in State ex rel. v. Peoples' Ice Co., 246 Mo. 168, wherein Judge James T. Blair, then commissioner, said:

"The statute of this State leaves scant room for construction. We are not concerned in this case with any question as to a contract, otherwise lawful, which incidentally restrains trade. The rule applicable in such a case is not applicable in this. Nor is it within our province to give the statute any other meaning than its language imports. Our duty to apply the statute as it is written is as plain as the language of that statute and in that language there is no ambiguity. The statute condemns every direct restraint of trade, great or small. It closes the only door through which doubts as to its construction could enter by positively prohibiting defined combinations without regard to what the courts may think as to the extent of their effect. The Legislature saw fit to ordain 'that competition and not combination' should obtain in business in the State. As long as it moves in its constitutional orbit the judgment of the Legislature is final and the wisdom of its enactments is not open to question in the courts.

"The case of Standard Oil Company v. United States, 221 U. S. 1, cannot be relied upon to elicit a different answer to the contention now being considered. In that case it was said, in effect, that the act of July 2, 1890 (the Federal Anti-Trust Act), was inapplicable to combinations and conspiracies in restraint of trade which did not have the effect of restraining trade unreasonably. A considerable portion of the opinion is devoted to the discussion of the question. The court did, however, hold that the Standard Oil Company *unreasonably* monopolized and restrained trade and, consequently, the reason for its discussion of the question as to what rule might apply when some defendant or combination which but *reasonably* restrained trade might appear at its bar is not apparent. Such discussions under ordinary circumstances are usually termed *obiter dicta* and not regarded as authoritative beyond their intrinsic value as arguments. We need not enter into a discussion of the decision in that case, however, since the rule

first stated is established in this State and since our statute precludes all question on the subject.''

In support of their claim that reasonable restraint upon trade is permissible under our statutes, respondents cite State ex inf. v. International Harvester Co., 237 Mo. 369, and particularly local citation 391. There it was said by VALLIANT, C. J.:

''In 1902, when the negotiations which led up to the organization of the International Harvester Company were begun, competition between the large harvester machine companies in the United States was such as to reduce the market to a condition that was deplorable from the standpoint of the competing companies and it is not certain that its tendency was towards the ultimate advantage of the consumer of those machines. Whilst the tendency of fair competition is to produce a wholesome condition of the market, yet competition may be of such a character and so designed as to destroy the weaker competitors, leaving only the giant in the field, who then would have a monopoly of the market. The law is not interested alone in the consumer, but it has regard also for the producer and would, if it could, protect a small manufacturer or dealer from the destruction that the avarice of a powerful rival might design. Therefore, the argument of the learned counsel for the respondent is not without force, that the competition that existed in 1902 in the harvester machine market was not the kind of competition that the lawmakers had in mind when they enacted the anti-trust statutes. *But unfortunately for that argument it is impossible for the Legislature to prescribe a general rule by which competition conducive to a wholesome condition of the market can be distinguished from a competition that is demoralizing and disorganizing.* In a late case (Standard Oil Co. v. United States, 221 U. S. 1), the Supreme Court of the United States held that the act of Congress which prohibits contracts in restraint of trade was to be construed in the light of reason, and when so construed it did not forbid the making of every contract that had for its purpose

a restraint of trade, but only such as had for its purpose an unreasonable restraint of trade; and, for an example, the court referred to contracts whereby a voluntary restraint would be put by an individual on his own right to carry on his trade or calling; contracts of which character were by the common law of England at one time held to be void, but the doctrine was afterwards modified so that it was only when a restraint by contract was so general as to be coterminous with the kingdom that it was treated as void. Reading the whole opinion in that case we infer that when the court says a reasonable restraint of trade is not forbidden by the statute, it refers to the restraint which is placed on the trade by the terms of the contract or by the act in question. Under that decision as we understand it, if a contract provides for a reasonable and lawful restraint of trade it is not forbidden by the statute or if the act done is potential only of such a reasonable restraint it is not condemned. Under the rule there laid down if a contract in question or an act of combination is significant or potential only of a reasonable restraint of competition it is not within the condemnation of the statute. But when a contract or act of combination is to be upheld on the theory that it is only a reasonable restriction on trade, it must appear on the face of the contract or act that the restriction which it creates is limited within reasonable bounds. It will not avail one who attempts to defend a contract unlimited in its terms or an act that is unlimited in the apparent scope of its power, to say that it will be used only in a moderate degree. The law is jealous of an unlimited power in such case in whosesoever hands it may be placed.'' (Italics ours.)

We do not understand from the language quoted that this court was committing itself to the theory of legality of contracts in reasonable restraint of trade or curtailment of ·competition. Judge VALLIANT was there discussing the meaning and effect of the decision of the United States Supreme Court in the Standard Oil Case, 221 U. S. 1. The language of the Federal Anti-Trust Act

is quite different from our own. Sections 1 and 2, which were under consideration in Standard Oil Company v. United States, 221 U. S. 1, are quoted in full by Mr. Chief Justice WHITE at pages 49 and 50, as follows:

" 'Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce, among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract, or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

" 'Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.' "

No provision of such clear and unambiguous meaning as our Section 9658 is found in the Federal Act.

Judge VALLIANT in the International Harvester Case then proceeded to discuss principles controlling in the case then under consideration, which we think are in point in this case:

"In the case at bar we are to take the acts of the parties and judge their purposes by the consequence that would naturally result. When men deliberately and intelligently go to work and acquire power that will enable them to control the market, if they choose to exercise it, there is no use for them to say that they did not intend to control the trade or limit competition, nor when the legality of their act of acquisition is in question is it any use for them to say we have not used the power to oppress any one. Counsel for respondent argue that

the mere possession of power incident to the possession of wealth is not unlawful if it is not unlawfully exercised and that is so. Wealth is power, and it may, without violation of law, be exercised to influence the market. The statute we are now considering is not designed to limit the amount of wealth one may lawfully acquire, therefore not designed to limit the influence that wealth may exert, but it is designed to forbid the acquisition of power for the purpose of influencing the market by combinations of interests that otherwise would compete in the market. The law regards such a power acquired by such a combination as dangerous to the rights of the people and forbids its acquisition. If immediately on the organization of the International Harvester Company and its appointing the respondent to act as its agent and before any of its products were put on the market an information in *quo warranto* had been presented in court against it, it would have been no answer to the complaint for the respondent to say: True it is we have this power, but we are not going to use it to the injury of the farmers or of other dealers in the same kind of implements. Neither is it any defense, after operating under the power for a time, to say we have not up to this date used the power to injure anyone."

Discussing our statutes in a concurring opinion in the same case, Judge GRAVES said:

"The several clauses purposely placed therein by the lawmaking power do not mean one and the same thing, but were put there purposely to be far reaching in effect. It was intended to reach all conceivable methods which might be designed by shrewd 'captains of finance.' The purpose of the statute was to thwart action in the very incipiency as well as all down the line. It was designed to reach all arrangements, etc., which were designed and made with the view of lessening competition, as well as those which in fact did that thing. Either class falls equally under the ban of the statute—one no more nor less than the other."

Respondents cite State ex inf. v. Armour Packing Co., 265 Mo. l. c. 178, as supporting the legality of agreements which only reasonably restrain trade. The language there used was not the language of the court. It appears in the dissenting opinion of Judge BOND. The other cases relied on by respondents are from other jurisdictions and not binding on us, in view of our own positive rulings on the subject and the clear language of our own statute.

The practices of the Exchange are not essentially different from those of the insurance companies which were condemned by Court in Banc in State ex inf. v. Firemen's Fund Insurance Co., 152 Mo. 1. Prior to 1895 the anti-trust laws were not deemed broad enough to include combinations and agreements among insurance companies fixing rates. In that year an amendment was secured which did include them. One Fetter had previously been employed to fix rates which all the companies agreed to follow. Thereafter Fetter issued his own rate-books and sold them to the companies. In 1897 the law was further amended and strengthened. The local agents of the respondent companies formed a so-called social club of underwriters at St. Joseph. MARSHALL, J., then proceeds as follows:

"After the formation of this club, the fire insurance done by the agents of the defendant companies was carried on in this way: The secretary had a list of the numbers of all policies in the agent's office, so as to enable him to keep check on every daily report that went to the company; the daily report contained the name of the company by which the policies were written, the name of the assured, the date of issuance and of expiration, the amount of insurance, premium, rate, general form of policy, the property insured, with its location. These daily reports were made out by the agents, placed in stamped but unsealed envelopes addressed to the company issuing the policy, and the envelopes were turned over to the secretary of the club for inspection and to be sealed and mailed by him. He kept no record of any-

thing that was done in his office, but at first, if there was a variance between the rate specified in the policy and that fixed by the Fetter rate, the secretary would put a small slip on the report to notify the general agent of the company of the variance; afterwards it was thought 'inexpedient' to have any such matters in writing, so the secretary simply notified the agents verbally of any variance and demanded to know the reason therefor. In this way every daily report from an agent to his company passed under the inspection of the secretary, and he alone mailed all reports to the companies. To prevent an agent from writing a rate in the policy in conformity to the Fetter rate and afterwards giving the insured a rebate, all the agents also submitted all their monthly statements to the secretary and he inspected them and likewise mailed them. Several times an agent was detected not living up to the Fetter rate, and then the club met and the offending agent was called on for an explanation, which was accepted as satisfactory and 'everybody arose to their feet and expressed a determination to live up to the rates' (Fetter's rates). There was an unwritten by-law of the club prescribing that 'where a member was caught cutting a rate there was to be a penalty of not to exceed $50, for the first two offenses, and after that loss of his agency.' Some of the general managers of the defendant companies testified that they had never heard of the club or its practices until this proceeding was begun; others testified that they had expressly refused to allow their agents these club expenses and had charged them back to the agent; while the manager of the Queen Insurance Company wrote the local agent as follows: 'While we are not fully advised as to the situation in St. Joseph, yet, at the same time we understand that all agents, with the exception of your good self, are now members of the Social Club. In the interest of harmony and correct practice we trust you will find it convenient to associate with the organization referred to, as it will undoubtedly redound to our mutual welfare.' ''

The conclusion reached by Judge MARSHALL was that "the Underwriters' Social Club of St. Joseph is a plain, palpable, but bungling, pool, trust, agreement, combination, confederation and understanding organized to evade the anti-trust laws of Missouri, but wholly inefficient for such a purpose. The local agents did it and all knew it, and their knowledge is the knowledge of their companies, and their acts are the acts of their companies."

It would seem that the conclusions reached by this court en banc in State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, should have served as a warning to respondents. Apparently there was no compulsion exercised upon the lumber dealers in the organization considered in that case. Possibly respondents here felt that the agreement not to sell below minimum prices, fixed by so-called actual costs, differentiated the cases. In many of its essential facts the Arkansas Lumber Company Case is quite similar to the case at bar. We quote from the opinion as follows:

"The association was, as we have seen, organized in 1890; it had when this suit was instituted some three hundred members, who controlled at least one-third of the output of yellow-pine lumber in the United States. When this action began and for many years before, the association was annually expending in the conduct of its affairs from $60,000 to $75,000 per year, out of which sum the secretary was paid an annual salary of $8000, and of which sum one respondent alone paid $2500 per year, although until 1906—sixteen years after its organization—it had no word in constitution or by-law publicly setting forth and declaring the objects of its organization and maintenance, the *raisons d'etre,* of its living, moving and having its being. At the meeting held in Memphis on the 27th of February, 1906, there were present some six attorneys, who, after viewing the transactions of the association, recommended that an amendment to the constitution be had, which should set forth to the public the association's excuse for existing. Ac-

cordingly in July, 1906, at the semi-annual meeting in Chicago, article 3 to the constitution was adopted. This article is as follows:

" 'The object of this association shall be to secure a full understanding of the conditions surrounding the lumber market in the territory covered by this association; the establishment of uniform grades for the inspection of lumber; to promote uniform customs and usages among manufacturers of lumber; to procure and furnish to its members such information as may tend to protect them against unbusinesslike methods of those with whom they deal, and such other information as may be for the benefit of the members of the association; and to propose and carry out such other measures as may be deemed for the welfare and in the interests of the manufacturers of lumber, who shall be members of this association.'

"Unfortunately for a clear and connected showing of the dealings of the Southern Lumber Manufacturers' Association and the Yellow Pine Lumber Association, the secretary had destroyed 'as junk' in 1906, all of its records, including letters in letter files, up, apparently, to the very date of destruction."

Concerning the price fixing features, Judge FARIS said:

"This brings us to a consideration of the proof upon the charge that respondents fixed the prices to be charged for yellow-pine lumber in this State. The learned commissioner finds that respondents are guilty also upon this charge. Practically from the organization of the association of yellow-pine-lumber manufacturers and dealers, this association issued a price list. We need not go back in the discussion here further than the year 1902, however. At each annual meeting there was appointed by the Yellow Pine Association a committee of members thereof, consisting of from ten to fifteen of the largest manufacturers and most prominent and aggressive members of the association.   .   .   .

"This Committee on Values was a standing committee, which made report at the annual and semi-annual meetings of the association, recommending given and stated prices for each item of the several grades and specifications of lumber manufactured and sold by the component members of the association. These reports of the Committee on Values were adopted by the association as the prices to be charged for the several items and grades of lumber. The Committee on Values also, if need arose, met in the interim between the annual and the semi-annual meetings of the association and promulgated new price lists of yellow-pine lumber, which lists the committee transmitted to the secretary and the latter sent out to the members of the association. In the year 1905 seven such price-lists were gotten out. These conditions subsisted till some time in the latter part of the year 1905 or the early part of the year 1906, when legal investigations of the methods of the association, or of certain of its component members, having been set on foot in the State of Mississippi, the Yellow Pine Association, through its board of directors, unanimously adopted a resolution on the 24th day of January, 1906, providing that the Committee on Values should no longer make any report other 'than of existing conditions applicable to the trade,' and that such committee should not make *any recommendation affecting prices to be charged for lumber or the amount of the product or output thereof.*' This resolution, as well as the reasons for the adoption of the same, are set out *in extenso* in the statement of the case. No report of the Committee on Values was presented to the following annual meeting. But at the next meeting of the board of directors a new section was added to the by-laws of the association. This section was adopted February 27, 1906, and is as follows:

"'Section 5. A committee of thirty shall be appointed by the president, to be known as the "Market Committee," whose sole duty it shall be to ascertain from time to time and in such manner as they may deem advisable, the prevailing market price of the various

classes of yellow-pine lumber and the existing conditions as to supply and demand for the same, and to cause the facts thus ascertained to be disseminated from time to time among the members of the association; and it shall be the duty of the secretary to aid said committee in the discharge of its duty.'

"The committee of thirty was appointed. The names on it are familiar names upon the record. By the advice of counsel they never acted, but later the matter of getting out a price-list of lumber, or a 'Yellow Pine Price Current,' was turned over to George K. Smith, the secretary of the Yellow Pine Association, who selected a list of sixty-three correspondents, for the major part members of the association, from whom he got monthly reports of the prices which they were asking for lumber of the several kinds, grades and specifications adopted by the association. From these reports, he says, as a basis he made up a flat rate sheet of delivered prices upon a basis of a freight rate of twenty-three cents per hundredweight. We need not here go into the details of the printing, dissemination and promulgation of this list. We have set these out in the statement. Suffice it to say that the prices shown by Secretary Smith's compilation of the reports of his sixty-three correspondents, were unfair; they are styled by the learned commissioner 'boosting' prices. If a great majority of the sixty-three reports showed no advance in the price of a given item, the price list would yet, almost without a single exception, show an increase in the price of this item. From time to time flat-rate lists were made up; from these as a basis booklets were prepared, showing delivered prices on the various kinds and grades of yellow-pine lumber at freight rate from ten cents to forty-five cents. These booklets were issued by the association and so stated upon their title-pages, till as late, at least, as December 27, 1905. They were called 'Yellow Pine Price Currents' till, at least, as late as July 18, 1906, and were afterwards styled 'Market Reports on Yellow Pine Lumber.' Till December 27, 1905, they bore a date,

stating at what time the prices therein became effective, and this, too, whether they were gotten out, or purported to be, by the individual members of the Yellow Pine Association or by the secretary of the association. Some nine to thirteen thousand of these lists were printed for each *revision* of prices and sent out by the secretary. Sometimes a special cover, as for the Long-Bell Lumber Company, would be used to enclose the flat list, or the booklets with the freight rates extended, in which case the members of the association, respondents and others, would give orders to the secretary for whatever number of copies of the flat-list or the booklet were desired. These would be fitted with the individual cover of the member, addressed upon the addressograph of the secretary of the association and by him sent out to retailers and customers of the members of the association. This, in brief, is a recapitulation of the acts of the association upon the charge under discussion."

Judge FARIS further said:

"That these prices were reasonable, as they contend, and such as in the nature of things might have eventuated regardless of the acts of respondents, does not help them; they may not violate the law and when caught red-handed say, as a defense, that their acts perhaps hurt no one, since the chances are the prices would have risen anyway (Addyston Pipe & Steel Co. v. United States, 175 U. S. l. c. 237); nor does it avail them to urge that the real object of the Yellow Pine Association was good, and that the ills which grew up in or grew with the association were unintentional. [State ex inf. v. Firemen's Fund Ins. Co., supra.] It is not necessary for an agreement which restrains trade to be entered into for the purpose of so doing; it is enough that the obvious and necessary effect of the agreement is to restrain trade. [United States v. Freight Association, 166 U. S. 290.]"

The conclusion we have reached is inevitable in view of the language in Section 9658, Revised Statutes 1919. *"All* arrangements contracts, agreements, combinations or understandings made or entered into be-

tween any two or more persons, *designed or made with a view to lessen, or which tend* to lessen, lawful trade or *full* and *free* competition in the . . . sale in this State of any product, commodity or article . . . and *all* arrangements, contracts, agreements, combinations or understandings . . . which are *designed or made with a view to increase, or which tend to increase,* the market price of any product, commodity . . . are hereby declared to be against public policy, unlawful and void; and any person or persons creating, entering into, becoming a member of or participating in such arrangements . . . shall be deemed and adjudged guilty of a conspiracy in restraint of trade." (Italics ours). It is the exclusive province of the Legislature to declare the public policy of the State and when the Legislature has outlawed *all* agreements, etc., "designed or made with a view to lessen, or which tend to lessen" full and free competition or which are "designed, or made with a view to increase, or which tend to increase" the price of any commodity, such declared policy is sacred ground which we may not invade. So long as the Legislature has declared such public policy within the exercise of its constitutional authority (and such constitutional authority has been repeatedly upheld by the court and is not challenged in this case), the courts may not add to or take away from the public policy thus declared.

In the Standard Oil Case, 218 Mo. at foot of page 378, WOODSON, J., said: "But even if that was not the common law, yet there is nothing in either the State or Federal Constitution which prevents the enactment of a statute prohibiting the making of all contracts in restraint of trade, whether reasonable or unreasonable."

Our statute is so explicit and all-inclusive in its language that there is left no room for construction by the courts. When the Legislature has denounced *all* agreements, understandings, etc., which tend to lessen full competition, or which tend to increase market prices, we may not construe such language to mean: All agree-

ments which *tend* to lessen competition, except those which do not unreasonably lessen competition, and *all* agreements which *tend* to increase prices, except those which do not unreasonably increase prices, shall be deemed against public policy and void. Other courts upon different statutes may have been justified in applying the "rule of reason." We will not undertake to distinguish such cases. Under the clear and explicit language of our statute, there is no room for such construction.

### THE PUNISHMENT TO BE IMPOSED.

Having reached the conclusion that respondents are guilty as charged in the information, the only remaining question for consideration is the nature and extent of the punishment to be imposed upon respondents.

The St. Louis Lumber Exchange is merely the instrument used by the other respondents to carry into effect their unlawful purposes. With its activities along the line of investigating costs of doing retail lumber business and ascertaining proper wholesale prices and disseminating information of such prices and general trade education and encouragement and stimulation of the public in the use of lumber, no criticism can justly be made. Its activities in eliminating dishonest practices, such as substitution and short measurements are entirely commendable and a positive benefit to the public. These evil practices are either violations of existing laws or subjects for legislative action. But the activities of the Exchange in fixing arbitrary dealers' costs, which are in fact retail selling prices, and in dictating credits, discounts and security for indebtedness, tend to and actually do restrain trade and are clearly unlawful. In doing these things the Exchange, and through it the other respondents, have clearly abused their franchises, exceeded their legitimate corporate powers and violated our anti-trust statute. Imposition of a fine against the Exchange is simply imposing an additional fine upon the other respondents. The present scheme of the Exchange

301 Mo.—35.

is so shot through with unlawful activities that the good cannot well be separated from the bad, and the bad eliminated. . The only effective punishment is to take the corporate life of the Exchange; to forfeit its charter.

With respect to our action in regard to franchises and rights to do business in this State of the other respondents, the only adequate punishment is unconditional ouster. In the numerous cases of this character, wherein we have adjudged corporations guilty of violating our anti-trust statute, we have fixed the punishment at fines and forfeiture of corporate rights, with conditional stays of execution as to ouster. Such judgments apparently have not served as a warning or prevented recurrence of similar acts by other business interests. Time and again this court has spoken in no uncertain terms denouncing such acts. It is time that we exercise the full force of the law, and, where we find the corporation guilty of violating our anti-trust statute, put that corporation out of business for all time. Such course is apparently necessary to instill in big business a wholesome respect for the law. The statute has teeth in it, if the courts have the courage to use them.

It is, therefore, the judgment of the court that those respondents who are incorporated under the laws of this State be ousted from their corporate franchises, and that those respondents who are organized under the laws of other states and have secured licenses to do business in this State be ousted from such franchises.

In addition to forfeitures of the charters of respondent members of the Exchange incorporated under the laws of this State and in addition to forfeitures of the licenses to do business in this State of respondents incorporated under the laws of other states, we deem it proper, just and necessary to impose substantial fines, payable to the State of Missouri, against respondents who are members of the Exchange.

In fixing the amount of such fines we are mindful of the facts shown in the record that the exchange has undoubtedly been an instrument operating for the good

of the public in many of its activities. The Exchange has not been in any large degree the cause of the tremendous increase in the price of lumber during its existence up to the date the testimony was taken in this case. We are satisfied, however, that the price fixing plan of the Exchange and features herein condemned, together with the cost of maintaining the Exchange (a very large sum in itself), have added materially to the already heavy burdens of the lumber consuming public.

The financial strength and amount of business done by the members should also be considered in fixing the amount of the fines to be imposed, as well as consideration being given to the extent of the activity of the particular member in the work of the Exchange, as we have gathered such facts from the record.

The good faith of respondents in joining the Exchange, remaining members thereof and participating in its activities, is also a matter for consideration. It is evident that respondents endeavored to go as far as possible in the direction of restraining trade and controlling the retail lumber business in St. Louis and immediate vicinity, without subjecting themselves to prosecution under our anti-trust statute. In furtherance of this purpose they took legal advice from competent and highly respected counsel. That they did this to avoid violating the letter of the law, while undertaking to violate its spirit, seems clear. They had apprehensions and misgivings which impelled them to seek re-assurance from time to time by consulting other lawyers, both as an organization and as individuals. It may be that respondents did not intend to violate the letter of the law, but whatever their intentions we find they violated not only the spirit of the law, but its letter as well.

It is our conclusion, therefore, that punishment be imposed against respondents as follows:

Boeckeler Lumber Company, ouster and fine
 of .................................................$10,000
Clayton Lumber Company, ouster and fine
 of ................................................ 2,500

Cherokee Lumber Company, ouster and fine of ...............................$ 2,500

Louis Essig Lumber Company, ouster and fine of ................................ 2,500

Ganahl Lumber Company, ouster and fine of ................................ 5,000

S. J. Gavin Lumber Company, ouster and fine of ................................ 3,500

Goodfellow Lumber Company, ouster from its authority to do business in this State and a fine of .......................... 3,000

Phillip Gruner & Brothers Lumber Company, ouster and fine of .................... 7,500

Holekamp Lumber Company, ouster and fine of ................................ 3,500

Mound City Lumber Company, ouster and fine of ................................ 3,500

O'Neill Lumber Company, ouster and fine of ................................ 5,000

Prendergast Lumber Company, ouster and fine of .......................... 5,000

H. E. Rapp Lumber Company, ouster and fine of ................................ 2,500

Julius Seidel Lumber Company, ouster and fine of .............................. 10,000

St. Louis Lumber Company, ouster from its authority to do business in this State and fine of ............................ 10,000

Shallabarger Lumber Company, ouster and fine of ............................ 5,000

Vandeventer Lumber Company, ouster and fine of ............................ 2,500

Wiles-Chipman Lumber Company, ouster and fine of ............................ 10,000

Wilson-Land & Lumber Company, ouster and fine of ............................ 2,500

St. Louis Lumber Trade Exchange, ouster only.

The costs of this proceeding will be taxed against respondents.

Judgment will be entered in accordance with this opinion. *Woodson, C. J.*, and *Graves, Walker* and *Ragland, JJ.*, concur; *James T. Blair, J.*, concurs except as to absolute ouster.

## ON MOTION TO MODIFY JUDGMENT.

JAMES T. BLAIR, J.—Under our statutes "all arrangements, contracts, agreements, combinations or understandings" which are "made with a view to lessen" or which, in fact, *"tend* to lessen lawful trade" or full and free competition in the . . . sale in this State of any "product, commodity or article, or thing bought and sold" or "which are designed . . . to increase, or which *tend* to increase, the market price of any product, commodity or article . . . bought and sold" are declared to be "against public policy, unlawful and void;" and all persons participating therein "shall be deemed and adjudged guilty of a conspiracy in restraint of trade" and subject to punishment therefor.

Under the evidence respondents have been found guilty, and the next question concerns the punishment to be inflicted. The statute (Sec. 9661, R. S. 1919) gives the courts a wide discretion in fixing punishment under Article 1, Chapter 88. [State ex inf. v. Armour Packing Co., 173 Mo. l. c. 356.] This ranges from a nominal fine to one as large as may be deemed right; or the court may declare forfeit the rights and franchises of a domestic corporation and the license of a foreign corporation, and, in addition, may confiscate to the State all or any part of the property of an offending domestic corporation and all or any part of the property, in the State, of a guilty foreign corporation.

This is not a case on appeal in which a jury's verdict includes an exercise of discretion as to the amount of punishment deserved. This court in this case is under the necessity of deciding this as well as the question of guilt or innocence. The two functions are legally separable and logically separated and require consideration of the record facts from two materially different points

of view. This is obviously true and if it were not true the investiture of a discretion in respect to the punishment would be a manifest absurdity.

It is not until after the question of guilt or innocence has been determined that the question concerning the punishment to be inflicted can arise. It is indisputable that there may be facts which have no relevance to the issue of guilt or innocence which are pertinent to the determination of the punishment to be inflicted. The granting of discretion in fixing punishment is doubtless due in large part to this fact. In searching a record for the facts tending to prove or disprove guilt merely mitigatory circumstances are of no real consequence, and the investigating mind is not and ought not to be greatly impressed by them. They do not constitute defensive matter. They are of great consequence in the exercise of discretion in fixing punishment. Unless specifically considered with this distinction in view the tendency of the mind to reject them which was properly present when the record was read on the issue to which they are not relevant, may inadvertently project itself into the consideration of them in connection with the issue to which they are quite relevant, and their improperly diminished force will be reflected in an excess of punishment.

The cases presently to be cited demonstrate that heretofore this court has clearly had all this in mind, and the modification of its judgment in cases like this show the substantial results of reconsideration of the record in fixing punishment. In view of these things it is proper, preparatory to the final exercise of its discretion in fixing punishment in this case, that this court re-examine its precedents and read again this record with an eye single to the punishment to be fixed. The motions to modify cannot be safely ruled until this is done.

There have been a number of prosecutions for violation of the Anti-Trust Act which have been heard in this court, and it will not require much space to epitomize them.

In State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1, respondents were adjudged guilty of having combined to fix and maintain rates and monopolize the fire insurance business in St. Joseph, then a city of about 65,000 inhabitants. They were found to have accomplished these unlawful purposes. They constituted a formidable aggregation of capital. They were foreign companies. They habitually, methodically and knowingly violated the anti-trust law. Each was fined $1000, and the record shows judgment of ouster rendered June 30, 1899; motion for rehearing was filed July 8, 1899, and overruled July 14, 1899; motion to modify judgment of ouster sustained July 14, 1899, and ouster suspended as to each respondent upon payment of its fine of $1000. No other condition was attached. This explains the reference in State ex inf. v. Armour Packing Co., 173 Mo. l. c. 393, to the judgment in the Firemen's Fund Case as a "suspensive order."

In State ex inf. v. Armour Packing Co., 173 Mo. 356, and in State ex inf. v. Swarzschild & Sulzberger Co., 173 Mo. 394, the charge was that the Armour Packing Co., Hammond Packing Co., Cudahy Packing Co., Swift & Co., Armour & Co., and Swarzschild & Sulzberger Co. had conspired to fix and control prices of dressed beef and dressed pork and packing house products in Missouri. Respondents were found guilty of open, gross, studied and habitual violations of the statute. Each was fined $5000. Ouster was ordered stayed upon payment of fine and costs.

The respondents in State ex inf. v. Standard Oil Co. of Indiana et al., included the company named, the Waters-Pierce Oil Company and the Republic Oil Company. The Standard Oil Company of Indiana was capitalized for a large sum, but its chief significance in respect to capital employed or represented was that it was in Missouri the licensed arm of the parent corporation, the Standard Oil Company of New Jersey. The Waters-Pierce Oil Company had a capital of $3,000,000 and assets of $12,000,000. It was a Mis-

souri corporation. The Republic Oil Company had a capital of $350,000, of which $60,000 was employed in Missouri. The Standard and the Waters-Pierce had divided this State between them. They did not compete. When an "independent" entered the field of either, the Republic Oil Company was "set upon" it to undersell and destroy it. The Republic Oil Company was owned by the Standard interests, and it had no other function of consequence except to pose as an independent and destroy those who had the temerity to attempt to compete with either of the two companies first named. "And when the Republic Company had sufficiently chastised the independents . . . by the reduction of prices of oils or otherwise, it would then practically retire from the field of operation and eagerly await the next combat with the independents, if, perchance, any one of them was so (sic) timorous as to challenge the monopoly of those two companies by seeking a portion of their trade." [218 Mo. l. c. 445.] This court fined each of the respondents $50,000, and suspended the ouster as to the Standard and Waters-Pierce companies. [218 Mo. 477, 478; 251 Mo. 271, 272, 273.]

In State ex inf. v. International Harvester Company of America, 237 Mo. 369, respondent was merely the sales-agent of the International Harvester Company (of New Jersey), which had a capital of $120,000,000, and did about 85 or 90% of the harvesting machinery and farm implement business of the United States. It was formed by combining the five principal competitors in these lines, and later acquired others, and thereafter was able to dominate the field. The finding was that the principal was guilty. The punishment was inflicted upon the agent which, alone, was licensed in Missouri and could be and was brought before the court. Respondent was fined $25,000 (237 Mo. 420), and permitted to take out a new license in Missouri on stated conditions.

In State ex rel. v. Polar Wave Ice & Fuel Co., 259 Mo. 578, this court had before it, on appeal, a judgment of the St. Louis City Circuit Court finding the Polar

Wave Company guilty as the instrument of an unlawful combination to lessen competition. The trial court had found the company had been formed by combining seven principal competitors in the ice business in St. Louis. It was a deliberate and successful effort to dominate the market and fix ice prices in that city. This court set aside that judgment, and rendered judgment imposing a fine of $50,000 and staying ouster upon conditions.

In State ex inf. v. Arkansas Lumber Co. et al., 260 Mo. l. c. 261, the parent combination affected included about three hundred plants and represented a great collection of capital. A single "curtailment" programme carried on for six months yielded $6,298,000 in profits to manufacturers and $2,210,000 to members. One Missouri corporation's share of this was $260,381. This case shows that the violation of the statute was regularly conducted as the sole business of the association. Fines imposed ranged from $1000 to $50,000. Ouster suspended on conditions.

In State ex inf. v. Armour Packing Co., 265 Mo. 121, the Armour, Swift and Morris companies were again at the bar of this court. The organization of the National Packing Company as a holding company and to buy other competing companies was charged and proved, and the operation of this company as an agency in attempted concealment of methodical, habitual and persistent law-violations by three great packing companies and others, was charged and proved. The allegations were that respondents had combined to fix, regulate, control and maintain prices, quantity of sales and competition in the sale of beef and beef products in Missouri. A fine of $25,000 was adjudged against each company and ouster ordered stayed on condition. On November 14, 1916, these fines were reduced to $12,500 each, but the judgment of suspended ouster was left unchanged.

This court forfeited the license of the Republic Oil Company, 218 Mo. 1, and sustained a judgment of ouster against the People's Ice, Fuel & Storage Company, 246 Mo. l. c. 176 and 223, but these were mere agencies employed to further the unlawful plan under review, and

bore to the other respondents in the respective cases a relation comparable to that borne by the St. Louis Lumber Trade Exchange to the other respondents in this case. It does not appear that any absolute judgment of ouster heretofore has been finally sustained by this court in a case of this kind against any corporation in a position at all comparable to that of the retailers in this case.

It thus appears that to this day this court has habitually suspended judgments of ouster, however great the combination of capital haled to the bar, however open, deliberate, avaricious and flagrant the offense charged and proved, and however clear and indubitable the proof made. With these precedents in mind, the record is to be read again with an eye single to the fixing of punishment.

It will not be amiss again to state some of the facts and bring out some of the conditions with especial reference to this question. The use of lumber in St. Louis and vicinity was so much stimulated by the demand created during the construction period of the World's Fair held in that city that a number of firms and corporations, not previously engaged in it, were attracted to the retail business. The subsequent return to the normal demand for a community like St. Louis reduced the use of lumber to such an extent that the city and vicinity were oversupplied with retail lumber dealers, despite the normal growth of the city and section and consequent increase in the demand for lumber. Competition between the dealers became sharp and sharper. Gradually the devil began to take the hindmost unless the hindmost saw his Satanic Majesty first and retired from the contest. These reductions in the number of dealers and capital employed were not commensurate with the decrease in retail sales, and the struggle for survival continued. The stress became so great that the business became shot through with evil practices which resulted from the efforts of the dealers to keep their heads above the rising waters of loss and bankruptcy. The existence of these practices is proved by the evidence of both

relator and respondents and is testified to by representatives of respondents; by dealers in no wise connected with respondents or the St. Louis Lumber Trade Exchange; by large and small contractors who bought lumber and had no other connection with the retail lumber business; by users and buyers of lumber; and by several who are no longer connected with the retail lumber business, but who had been in it during a part of the period in question and who had either been forced out or had withdrawn because they were unwilling to participate in the practices in question and thought they could not continue on any other terms. The record leaves no doubt about it and is subject to no other construction. These practices included the substitution of grades; the substitution of species; intentional shortages in quantities actually delivered; various credit and financing devices whereby the contractors were virtually bribed and the contracts bought from them. Lumber easily lends itself to the deceit of the builder or purchaser, if the dealer and contractor desire to use it to that end. Once it is built into walls or, when exposed, is covered with paint, the cheating in the substitution of grades and species is so hidden that the owner or buyer cannot discover it, even if he had the knowledge necessary to its discovery before the lumber went into the structure—which would be very exceptional knowledge unless he were a lumber dealer himself. One method used in St. Louis was to submit bids which would call for the proper grades and quantities. The state of competition was such that these bids seldom added more than a dollar and fifty cents a thousand feet to the cost of the lumber f. o. b. St. Louis. Often they were less and even below that cost. The *usual* practice, as the whole evidence shows, was for the dealer who had made such a bid and had been awarded the contract, not to deliver the quantity and quality called for by the bid. It was impossible for him to do so and make any profit at all. In fact, this record shows beyond all question that ordinarily it would have been impossible to have avoided an actual and con-

siderable loss. Sometimes the dealer sent to the job the species of lumber called for, but sent a cheaper, an inferior grade. In others he sent a different, inferior and cheaper species. The balance of his cost and his profit, if any, he got by means of those deceptions. If he were caught, the material was hauled back to the yard and he lost the sale; or, if his explanation satisfied, he might, to save his face, send out the material he had agreed to send. The loss in these cases he covered by overcharging small buyers who relied upon themselves in making purchases and had no knowledge of grades, species, measurements or prices. If a contractor in charge of the work knew his business, he could detect substitutions and shortages. That some contractors did make such detections resulted in favors being shown them in the way of credits, discounts, rebates and financing schemes which, with some of them, induced a frame of mind more lenient toward the retailer's methods or prices. Other contractors made use of conditions to play off one dealer against another. The lumber requirements of a contract would be submitted to various dealers, but bids would be asked from one dealer on one grade or species and from another on a different grade or species. Then the contractors would approach one dealer with an intimation or a statement of the amount of another's bid and the offer of a preference, and could sometimes secure, at an inadequate price, the quality he desired by creating this impression of competitive bids. In fact, the bids taken were not competitive, but covered different qualities of material. The bids themselves would not be disclosed, merely the total amount. Sometimes dealers were asked to bid on different quantities, in lump sums, and these bids were used in the same way. Sometimes a bid for a quantity less than the amount of lumber required was accepted and subsequently the owner learned that the estimate of material needed had been too low and more must be purchased. Things were in such a way that one group of contractors who desired to get the material in kind and quantity which a job required, organized a lumber company and began to

supply their needs in that way. Some dealers failed in business. A few liquidated and quit. Two or three firms abandoned the retail business and confined themselves to wholesale trade. In the meantime the consumer got all the worst of it in that the structure he built or purchased was made of inferior lumber. In the meantime dealers in other building materials were actively pressing the advantages of the products which they sold. Advertising campaigns advised the public to use substitute roofing, lathing, siding, and the like. The impression got abroad, or was put abroad, that lumber resources were nearing exhaustion and that the builder would as well accustom himself, without further delay, to the use of other material. In the city of St. Louis ordinances were passed which lessened the use of lumber. For instance, the required thickness of walls of which brick constituted a part was increased to thirteen inches. This affected or prohibited brick veneer construction. Other ordinances limiting lumber use were enacted and subsequently discovered by the lumber dealers. The retailers had an organization of a sort which seems to have accomplished nothing until in 1912 it adopted a price agreement. In a very short time it was discovered, of course, that this was unlawful and it was at once abandoned. There is no evidence that either before or after this four months' period this old organization had any sort of agreement as to prices. The old conditions were hardly interrupted, much less eliminated, by this agreement of 1912, but continued from that time forward. The retail business was not only unprofitable, but the prevailing practices were immoral. In what they evidently regarded as self-defense, dealers who knew well enough that the practices in question were wrong, participated in them nevertheless, spurred by the instinct of nature's first law, because they felt they had to choose between participation and being driven out of their chosen business—as some were driven out. It is obvious that for some time the dealers in looking at the moral question involved, gave especial emphasis to the fact that, as it appeared to them, com-

petitors were endeavoring to destroy their business. Each seems to have regarded the others as business pirates, to be fought with every effective weapon. Gradually the effect upon the consumer, that innocent bystander who seems to have infinite capacity to withstand punishment, and the effect upon the lumber business itself, began to obtrude themselves, and the idea that these conditions ought to be rectified was born.

Whatever may be said of its importance, or even competence, upon the question of guilt or innocence, it it clear that the existence of the practices detailed would call for remedy, and that the conditions described, proved beyond question to exist, ought to be understood and kept in mind when what was subsequently done is considered with respect to the punishment to be inflicted.

The men who are responsible for the formation of the St. Louis Lumber Trade Exchange, in fact all the retail dealers, are entitled, on this question, to have their acts judged in the light of all the facts and conditions which enmeshed them at the time and to have their motives and intentions finally judged on the evidence in the record. There is no doubt that a cold-blooded entrance into a deliberate contract to unite in robbing a community by the method of fixing prices is not only contrary to the statute, but is highly immoral, as well. Upon this relator, respondents, counsel and the court all agree. The question whether this record shows such an agreement in its worst form or shows something less is another matter, and is to be solved by the record.

About the first of the year 1917 one of the gentlemen who was a member of the old organization, attended a meeting of lumbermen in Chicago, at which an address was made by Hon. L. C. Boyle, ex-Attorney General of Kansas and a lawyer of ability and distinction. The St. Louisan's interest was aroused and he talked with Mr. Boyle. He returned to St. Louis, and the upshot of the matter was that Mr. Boyle was invited to address the lumber dealers of St. Louis, and subsequently did so. He seems to have been told of conditions in St. Louis.

He discussed them and in a general way suggested what he assured his hearers were legal methods of removing the evils which certainly existed. As to the details of organization he recommended that Hanks & Gregg of Chicago be called in to advise. This was thereafter done and they evolved the charter and by-laws of the St. Louis Lumber Trade Exchange. These were submitted to Mr. Boyle and received his approval, and this approval was communicated to the gentlemen concerned in St. Louis. Quite a number of the St. Louis dealers went further. They submitted the plan to their own counsel and those counsel approved its legality. It may be said that the question of legality of the plan under our law was passed upon by a list of lawyers which contains names which are well known for ability, learning and integrity, and it would require considerable hardihood to intimate that any of the number would render a legal opinion except in the best of faith, for any reason. All this the organization had before them when they instituted the St. Louis Lumber Trade Exchange. At this time, then, the members are to be judged in the presence of the conditions which surrounded them, which no one will deny were not only ruinous to the dealer but injurious to the consuming public and to the lumber trade as a business, but wrong in themselves. Further, it does not appear that relator or any of his witnesses have been able to suggest any method which would have been available to correct the then existing conditions, and it is certain that respondents theretofore had been unable to find means to extricate themselves except by voluntary or involuntary retirement from the field. It ought not to be held on this record that respondents were not in good faith desirous of putting the business on a right basis. In addition, their course, intent and motives ought to be examined in the light of the legal advice they took, and that advice ought to be viewed as it appeared to them, strengthened and fortified by the ability and character of counsel who gave it. It is not to be understood from this that any advice from any source can be put forward as a defense

to the charge in this case. It is meant that the things stated have to do with the amount of punishment to be inflicted.

Normally, the retail cost of goods to the consuming public is made up (1) of the wholesale cost, (2) freight to the retailer's location, (3) the cost of handling from the car or barge through the store or yard to the consumer, and (4) the retailer's profit. The first and second of these are pretty well determined for the dealer by agencies outside of his control. The third covers the whole cost of his retail organization and operations. It includes numerous elements, as is obvious. The fourth explains itself. It was apparent to the dealers, both respondents and the others, at the time, and is apparent to any reader of this record now, that the objectionable practices in the retail lumber trade grew out of the strenuousness of the dealer's efforts to get replacement cost or more, in the face of competition of a character which had introduced unscrupulous methods of getting business. In the heat of the fight with each other, certain moral distinctions were forgotten, first by a dealer or two, then by many as the trade became further infected. The disease was progressive. In its progress the point was finally reached at which there came the consciousness that the public, the business and the dealers themselves were all involved. All were suffering injury, and that without net benefit to any. In view of all this there is logic in ascribing the existing difficulties to the failure of retailers to realize the fact that they were pricing their stocks at less than the cost of replacement plus the cost of handling. The cut in bids was counterpoised by the tricks and schemes detailed. These were the methods which were used to prevent loss on bids made at sums less than actual expense of delivery to the consumer. That there is no moral wrong in including in the retail price the wholesale cost, freight and cost of handling must be conceded. That there is something less than moral in a condition which would take from the retailer his stock at less than his total cost of delivery to the con-

sumer will hardly be denied. That this is true of a state of affairs which leaves the dealer the option of selling for less than such cost or quitting his chosen business is hardly more open to denial. Efforts to correct existing practices had been made and failed. The cause was obvious—the not unusual inability of human nature to resist the temptation to save itself by questionable methods after it becomes involved in a struggle in which such methods are used against it. The elimination of these methods was the problem. The cause of their coming into use seemed and is clear, from the evidence. Since it was apparent that the effort to avoid losses caused the trouble, in the business, it is not surprising that it was thought that an effectual corrective must in some way remove the cause. The question was whether this could be done within the law. As stated, respondents were assured, orally and in writing, that this could be done and that the plan adopted was legal and sound. That plan took the cost of lumber, f. o. b. St. Louis, as the basic element. Then the "service charge" was added. This charge was made up of numerous items of costs of handling from the car to the consumer. It did not include them all. At no time was the wholesale price, plus freight, plus the service charge, equal to the cost to the dealer of delivering the goods, when the service charge is measured by the standard of the average of the ten or more most efficient St. Louis yards.

It is argued in relator's brief, and this finds some favor in the opinion, that the service charge included a profit. The overwhelming weight of the evidence is against this conclusion. The publication of the chart with the service charge line designated as the "retail price" is used to show the contrary. It was so published. Relator quotes a part of Hoxie's testimony to show that the retail price was in fact fixed at the aggregate of the wholesale price (including freight) plus the service charge. Hoxie's testimony is conflicting. He testified, point blank, that this aggregate was not the retail price in St. Louis. Then he said there were doubtless sales

301 Mo.—36.

at that price. Under a skillful examination he testified the aggregate showed "roughly" the retail price; that the chart showing the rise and fall of the wholesale price and the service charge was hastily prepared for the use of the Attorney-General; that in a general way it showed the retail prices; that it was published as the retail price and was not put out to deceive the public; and, finally, that it showed the retail price. The witness was responsible for the advertisement, so far as this question is concerned, and was gradually backed into the position of trying to defend it as absolutely true in all its representations. In either construction it did substantially show, in a general way, the relation which the rise and fall of wholesale prices bore to the rise and fall of retail prices. It did not show the retail prices. Hoxie so testified in terms. It was not made up from retail prices. There was no sufficient data for that. It indicates a retail price, fixed in fact and in terms, and this is contradicted by the testimony of a cloud of witnesses, members of the Exchange and others; lumbermen, contractors, buyers, who testified to active competition in the retail trade during all the time covered by the chart except the period during which the Federal Government established prices. The advertisement was an adaptation of the figures of a chart furnished the Attorney-General, *post litem motam,* on which the line representing the "retail price" in the advertisement was shown as delineating the rise and fall of the service charge. It was used in the advertisement, in the St. Louis papers, for the general purpose stated, and was intended as an answer to charges made that lumber prices had unduly advanced in proportion to wholesale cost. In addition, another exhibit (No. 15) which does purport to show retail prices and which relator offered, prepared by Hoxie, shows that the retail prices were not the wholesale prices (including freight) plus the service charge. Hoxie was put in an embarrassing position, as it then seemed to him, and attempted to defend the advertisement to refute the inference that in it he had intended to deceive the public.

What he had done was to use a chart already made (in 1921) for the purpose of showing the *Attorney-General*, in 1921, the rise and fall of the market. That chart did not purport to show retail prices. Clearly it was not intended as an admission, at that stage of this contest, that the retail price, including a profit, was an agreed price. On its face it does not purport to show this. In using it as an advertisement Hoxie changed the designation of the "service charge" line to that of "retail price." That was incorrect, but it did put before the public, in terms it understood, a general idea of the rise and fall of prices, and, as the advertisement was intended plainly to do, gave exact figures on the wholesale prices. The advertisement was a defense of the dealers against the charge or implication that they were responsible for the high price to the consumer. That defense was founded mainly upon the increase in wholesale prices, for which the retailers were not responsible, and this was the dominant thing in Hoxie's mind, no doubt. The inference drawn from this incident is, in the circumstances, not warranted even if it stood alone. When consideration is given the mass of evidence introduced by both relator and respondents which overwhelmingly shows that the retail price was fixed neither in theory nor practice and that competition continued among respondents and between them and non-members, that inference can not be justified. The evidence conclusively shows that the increase in prices was mainly due to the increase in wholesale or mill price and freight. This price or cost increased from $29 in January, 1918, to $72 in March, 1920—over 148%. The retailers' expense of handling increased from $7 to $14 in the same time. Labor cost, a large part of the handling cost, increased enormously. Other costs went up. As the opinion shows, this estimated cost of handling did not include several items which in fact formed a part of it. The cost was determined by accountants who went to the books of respondents at intervals and computed the cost to the several companies. The average cost of the ten or more most

efficient companies doing seventy per cent of the business was taken as the service charge for the period. The cost of the several companies varied from 16.1% to 41.4% of the price obtained. The service charge was always less, in dollars and percentage, than the average cost of all respondent companies. This reduction, if the service charge was applied in full, amounted to more than forty thousand dollars per year to the consumers. It had the further effect to stimulate the dealers whose cost was high to reduce it to the level of the service charge. This applied its pressure continuously to induce the elimination of expense of handling and retail overhead. Inspection was established and the delivery of the quantity and quality agreed was thus secured. Bids were sent in and examined and it was thereby assured that the competitors bid on identical estimates, and errors in computation and extension were caught. After the contract was awarded, competing companies and no others, were allowed to see each other's bids. The dealers ceased to buy contracts by discounts, financial aid to contractors, rebates and the like. The practices aimed at were, in the main, stopped. The overwhelming weight of the evidence is that lumber, at all times (except during the period of Government-fixed prices) was lower in St. Louis and vicinity than in adjacent sections and in the Mississippi Valley cities—and others inland. Competition continued among respondents and between them and non-member companies. The practical identity of bids in two instances on city contracts is given too much importance. In the first place, the bids were on exceedingly small amounts of staple lumber and are comparable to letting the contract for a sack of flour to grocers in one community. Many hundreds of bids made to the city were available to relator. Respondents offered in evidence a large number of those, but relator did not print them. The official in charge of letting city contracts in all cases in which no single item exceeded $500 produced these, and testified generally to competition among the retailers of the city. One witness testified bids were

alike, but his testimony is contradicted by the evidence just mentioned, and by the testimony of many witnesses, some who are respondents, some who were retailers but did not belong to the Exchange, and contractors and buyers.

The witnesses are almost unanimous in their testimony that during the formation of the Exchange in 1917 and in soliciting members thereafter, there was no representation or suggestion that price-fixing was contemplated.

The imposition of fines for deviations from the service charge seems to have been abandoned before this proceeding was begun. There were some things done against which, in themselves, we do not understand any real objections are urged. What sound reason can be advanced against the maintenance of a system of inspection by a group of competing retailers to determine whether a dealer has delivered the character, quality and quantity of material for which his contract of sale calls? And what objection can be lodged against the joint employment of an agent to furnish the trade with legitimate credit information? There seems to be no reason these things cannot lawfully be done. As to the first, it insures the buyer's getting what he has bought and aids in putting competition on a real basis, in that bidders must expect to deliver what they sell or suffer the exposure of efforts to cheat the buyer by selling one thing and delivering another. As to the second, it aids in protecting the dealers, and, through them, the honest and solvent buyers from the necessity of carrying the "dead beats" free of charge so far as concerns their use of lumber. For it is certain that credit losses must be covered by bills collected from solvent buyers or that the losing dealer will merely distribute his capital among those who do not pay. The system is employed by many groups of dealers for themselves, or the information is bought from agencies which make a business of collecting it. Unless these methods are illegal, and that is not suggested, the

collection and dissemination of credit information by respondents is not so.

Tested by the requirements of the statute, the system adopted was wrong; but when the good faith of the dealers is judged in the light of the facts shown by the record, it does not appear that their offense was committed in any such open disregard of the law as it is and was written in such fashion as appeared in several cases heretofore cited. The record abounds in proof to the contrary, unless all usual methods of weighing evidence are to be abandoned. It is proved by the evidence as to the intent of the dealers, the advice they took and the results accomplished.

The Exchange has had a payroll of considerable size. Its manager's, counsel's, inspectors' salaries and office expenses amounted to nearly $24,000 per year. Advertising campaigns to restore lumber to its former place in builders' esteem were conducted at large expense. The appropriation for that purpose for 1921 was $20,000. This combined advertising was cheaper than if the retailers had severally undertaken it. It was necessary, in view of the facts already stated. The income of the Exchange in 1918 was about $53,000. The excess above expenses was not very great. The opinion disposes of relator's suggestion that the Exchange had cost St. Louis and vicinity $2,500,000. This suggestion is necessarily based upon the assumption that if the Exchange had not been formed the system of cheating which preceded it would have continued and the public would have paid less to the retailers under that system. It takes no account of the fact that under that system the buyer did not get what he thought he was getting and that his smaller price was well matched and covered by inferiority in quality and shortage in quantity. It assumes that the amount and quality delivered under the two methods, on identical estimates, would be the same. If relator proved anything in this case, he proved the negative of this assumption.

But all that has been said does not constitute a defense. It does show that there is much to be considered on the question of punishment which did not appear in other prosecutions under the statute. In those cases this court was dealing with great corporations. The inference of a deliberate intent to violate the law and mulct the public in most cases was irresistible. No ouster was finally ordered in those cases. The court gave sound reasons for its course. Those reasons are more applicable in this case than in those in which they were given. The course the court took then has been vindicated by subsequent events. This is a necessary inference from the fact that the law officers of the State have never found it necessary to use against those previous defendants the ready weapon the court put into their hands. There can be no doubt they would have used it if reason for its use had come into being.

In this case a group of relatively small retail corporations, operating in one community, one very important community, is at the bar. They are domestic corporations, except two which employ nearly all their capital in this State. The suspended ouster plan, efficacious against great corporations, would be peculiarly effective in this case. The public and respondents' competitors easily and readily could and would discover any new violations. The impending punishment would constitute an effective deterrent. If it did not, the ultimate punishment could be inflicted promptly and at any time. If it did, then respondents would continue in competition in the retail business. If absolute ouster goes, a majority of the retail capital is at once put out of business in the district. The result is a reduction in the number of the competitors and, doubtless, the appearance of a large retail lumber corporation with many yards throughout the territory. Even if this does not prove true, and organizations are formed which, in a competitive sense, will succeed respondents, in any subsequent prosecution the State must again make out a whole new case. There is, so far as public benefit is concerned, a sort of suggestion of futility about the method of absolute ouster which seems

to show it to be far less effective to the end desired than is the method of sentence suspended in part.

As an argument against a judgment of suspended ouster it is quite irrelevant to say that corporations and individuals who have never been brought to account in the courts have violated the statute. The record does not afford any basis for such an argument. Further, it does not follow from the fact that one against whom no such judgment has been rendered has not obeyed the law that the rendition of such a judgment is futile in securing obedience from one against whom it has been rendered. Nor is it logical to say that a judgment of suspended ouster is ineffective to control one against whom it has been rendered when neither the court nor the law officers of the State have attempted to use the suspended judgment against one guilty of a second offense. It is also indubitably true that this court is in no position to take judicial notice of offenses, if any, committed by others than the present respondents, in order to swell the punishment in this case. If it can take such judicial notice for that purpose, it can do the like as against such others. If it can do this, and these others are living under a suspended ouster judgment, the court ought to proceed to fix appropriate additional punishment against them. If they have not been convicted previously and judicial notice can be taken of their offenses to increase the present respondents' punishment, then when the Attorney-General does proceed against them there will be no need of offering evidence to convict; judicial notice will cover the whole matter. For it will hardly be denied that if judicial notice can be taken of an offense in order to increase the punishment of one who did not commit that offense and is in no way connected with it, it certainly could be taken to convict him who did commit it. The arguments referred to are outside the record and so essentially invalid as to require no further comment.

There are special facts which affect particular respondents and constitute special reasons in their cases for judgments of conditional ouster, but the general rea-

sons applicable to all convince that it should be applied to all.

A more detailed discussion of the facts would add further certainty to the conclusion reached. Time and space impose their limitations. This is not a proper case for an absolute ouster, and an absolute ouster is not the effective way to deal with respondents.

The fines fixed in the opinion previously adopted constitute adequate punishment in this case. The order of absolute ouster is modified as to all of the respondents except the St. Louis Lumber Trade Exchange. The other judgments of ouster and forfeitures of licenses are suspended upon these conditions:

1. That the fines and costs be paid at a time which has been fixed as December 3, 1923.

2. That within sixty days after December 3, 1923, each respondent who desires such suspension shall show by affidavits of its managing officers (and others, if required) that such respondent, its officers, directors, agents and representatives, have withdrawn from all agreements and understandings with any and every person or persons, natural or corporate, which in any way or manner, direct or indirect, restrict or lessen competition, fix or affect prices, discriminate in favor of or against any dealer or dealers, buyer, contractor or other person, control or affect the amount or quantity of lumber and forest products in the market, or in anywise restrict open, honest and free competition in the lumber business, or violate, directly or indirectly, any law of this State relating to monopolies, pools, trusts and conspiracies in restraint of trade; that in case any person or persons, natural or corporate, shall suggest or offer to such respondent to form or enter into any agreement, plan or scheme in violation of any of such laws, such respondent will promptly lay the facts relating thereto before the Attorney-General of this State; that such respondent will not participate in the publication or distribution of any price current, except as derived from actual, bona-fide sales previously made in full competi-

tion; that such respondent is not now engaged in, and in the future will not engage in, any practice or practices, agreements or understandings which violate either the letter or the spirit of the Anti-Trust Laws of this State.

Jurisdiction is retained, and in case of any violation of the conditions of suspension of ouster, the court may, upon a showing made at the instance of the Attorney-General, re-open the case for further consideration and may convert the suspended ouster into an absolute ouster, or consider the further punishment to be adjudged. The motions to modify are sustained to the extent herein indicated and overruled in all other respects. All concur, except *Woodson, C. J., Graves* and *David E. Blair, JJ.*

ON MOTION TO MODIFY JUDGMENT.

GRAVES, J.—I concurred in the original opinion as filed, and the judgment of absolute ouster therein prescribed. I see no reason now to depart from that opinion upon the motion to modify the opinion to the extent of making the ouster conditional. That the defendants are guilty there can be no doubt. Courts are not blind as the bats of the air. They are entitled to draw inferences from undisputed facts before them. The intention of the parties to do an unlawful act is not often disclosed by the language used. On the contrary they usually try to hide the intent by their language and acts. But like sentinels in the forest there will be found (unintentionally left) earmarks which point to the real intent and purpose. That these parties are guilty is apparent from the "holier-than-thou" language used in the Preamble and the Articles of Association. It requires no peculiar gift of insight to read these documents and between the lines find written in red letters the guilt of respondents.

The high sounding language of these two instruments is but a gilded garment to hide a cloven hoof. They never consulted counsel (eminent or otherwise) in good faith. Their purpose was to violate the law, but to so

cover the tracks as to escape results, if a day of reckoning came, as it has come.  Who, before this, ever heard of a necessity to form an organization to eliminate alleged evil practices of the members of such proposed organization?  If lumbermen were guilty of petty thefts in the way of short measures, and substitution of grades, they would soon eliminate themselves from business by their own conduct.  The law afforded the public all necessary redress for such conduct.  The very declared purposes of this organization (gilded by studied use of words as they are) bespeak an organization founded in bad faith and for wrongful ends.  Not only this, but each of respondents went into the organization with full knowledge of its real purposes, i. e. the stifling of substantial competition, and filching the pockets of the general public by fixing prices.  Honest, law-abiding business men need no such organizations in order to conduct a legitimate business.  The real intent and purposes of the organization are as clear as the noon-day sun.  The respondents knowingly entered into the unlawful agreement, and should abide the consequences of their deliberate act.  All this appears from the contract itself, and the reading of evidence *aliunde* is not necessary.

It is urged that this court has heretofore adopted the plan of a suspended ouster.  This is true.  In the Polar Wave Ice Company case, the writer hereof undertook to assign our reasons for that course.  To us the reasons seemed to be sound, but conditions have changed.  A great war has come and gone, and with this period the spirit of combines, price-fixing and profiteering has grown, so that now (if current events can be read aright) every branch of commercial business is infected.  Within an hour's ride from this temple of justice a producer sold the hide of a calf, and wanting a measly pair of half-soles for his hard worn shoes had to add fifteen cents to the price of the hide to buy the half-soles.  We have tried out the suspended ouster, and in the face of our judgments unlawful combinations are holding orgies of profiteering by price fixing and otherwise, throughout the State.  Need we cite current events?  What these

are is known by all, and courts are presumed to know such current history. It is true, in the language of the opinion in this case, "that we should exercise the full force of the law, and where we find a corporation guilty, put that corporation out of business for all time."

Where corporations deliberately form another corporation for the purpose of fixing prices and curtailing competition, it is time to stop their existence in view of our past experiences with conditional ousters. They have not proven to be a deterrent, as we thought. The Federal Government has been forced to handle at least one of our conditionally ousted corporations. Without further elaboration, I am against the modification of our present judgment, and vote to overrule the motion to modify. These views have the approval of *Woodson, C. J.*

## ON MOTION TO MODIFY.

WHITE, J.—In addition to the expression in the majority opinion, in which I concur, I state these additional reasons for concurring in the order modifying the original judgment.

The difference between the judges of the court is not as to the guilt of the respondents, nor as to the amount in fines to be imposed. As I understand it, we differ mainly regarding the best method to secure future compliance with the law. Should the corporations be dissolved there is no certain way to hinder the individuals operating them from conducting the same business as individuals, or from forming under other names new corporations for the same purpose. It is better to allow them to continue business in the open rather than to continue under the veil of different names. In the latter case, a subsequent violation of the law would require another suit like this.

It may be argued that the statute prevents the continuance, under other names, of the business of the forfeited corporations. Section 9665, Revised Statutes 1919, contains the following:

"It shall thereafter be unlawful for *any person,* corporation, or association of persons, to deal in or offer for sale in this State any article of manufacture, mechanism, merchandise, commodity, . . . produced, manufactured or dealt in by any corporation whose rights, franchises or privileges have been so declared to be forfeited."

The section further says that the above provisions "are hereby made applicable in all respects to the successors or assigns of any corporation whose rights, franchises or privileges have been so declared to be forfeited."

The next section, Section 9666, attempts to apply the provisions mentioned to "natural persons, partnerships, associations of persons and corporations created or organized by or under the law of this State."

Numerous perplexing questions spring into view in determining the meaning and scope of that statute. If that language is to be given effect as it reads, nobody in the State of Missouri, after a forfeiture, could ever engage in the lumber business. The citizens of St. Louis would be obliged to bootleg their lumber from Illinois. To give the statute that meaning is to hold it unconstitutional.

Suppose it is construed to mean that the persons who have operated the dissolved corporation shall not again engage in the same business. Does anyone suppose it would be easy to give it such effect? Corporations are artificial persons and have no natural rights; they may be prohibited from engaging in any particular business. Natural persons have natural rights. Any person out of jail has the right to make a living at any lawful calling, and no legislative act can deprive him of that right. [Sec. 4, Art. 2, Mo. Constitution; State ex rel. v. Ashbrook, 154 Mo. 394; 6 R. C. L. p. 266.]

Suppose the construction of the statute be narrowed so as to prohibit any person from dealing in only the specific property owned by the dissolved corporations. The judgment does not forfeit that property to the State. A forfeiture of the property could not be implied from

the judgment of ouster, because the statute provides for an express forfeiture. That property consists of their stock, equipment and good will. With that construction the forfeiture of the franchises would increase the penalties to an uncertain degree, and perhaps enormously. The quantity of lumber and other material which the companies have on hand is probably in value many times the amount of the fines assessed. It could not lawfully be sold. The only value available from it would be the exhilaration respondents might feel in the production of a most extraordinary bonfire. It would be a needless waste of a commodity of which the builders of St. Louis are in urgent need. To avoid the puzzling questions which necessarily would arise in case of a continuance in business by persons who operated the offending companies, it is better to keep the corporations, which are now before the court, in their present identity.

The court retains jurisdiction of the cause and has the parties before it, and if at any time it should be deemed advisable we may revoke the suspension and order a complete ouster. We may, if necessary, at any time prescribe conditions, and require supervision, inspection, etc., at their expense, so that it will be impossible for them to violate the law without detection. It will be the duty of the Attorney-General to advise this court of any infraction of the law by respondents.

For these reasons I concur in the order to modify, and I favor holding the respondents in court, for a time at least, in their present character.

JUDGMENT.—Now at this day it is ordered by the court that the order heretofore made, overruling the motions of the said respondents to modify the judgment herein, be set aside and for naught held, and that the said motions of respondents, except that of the St. Louis Lumber Trade Exchange, be sustained in part, and to the extent indicated by the following further order: That the judgment of ouster herein as to all the respondents, except the St. Louis Lumber Trade Exchange, be suspended upon condition that they shall comply with all

other of the provisions of the original judgment herein, and upon the further condition that they, and each of them, furnish satisfactory assurance that they, and each of them, are not now violating, and will not hereafter violate, any of the provisions of the anti-trust laws of the State of Missouri. It is further ordered that the original judgment in this cause, except as herein expressly modified, stand in full force and effect, and that jurisdiction of the cause be, and the same is hereby, retained by the court.